UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY SACKETT,

       Plaintiff,

v

DICK'S SPORTING GOODS, INC. and
DOMINIQUE PERRON,

       Defendant.

Case No.
Lower Court Case No. 24-013055-CP
Honorable Qiana Denise Lillard

_____/

| | |
|---|---|
| Ryan B. Stearn (P57897)<br>THE LAW OFFICE OF RYAN B. STEARN, P.C.<br>Attorneys for Plaintiff<br>29829 Greenfield Rd., Ste. 103<br>Southfield, MI 48076<br>(248) 213-7443<br>ryan@stearnlaw.com | John R. Prew (P41891)<br>HARVEY KRUSE, P.C.<br>Attorney for Defendant Dick's Sporting<br>1050 Wilshire Drive, Suite 320<br>Troy, MI 48084<br>(248) 649-7800<br>(248) 649-2316 (fax)<br>jprew@harveykruse.com |

HARVEY KRUSE   A PROFESSIONAL CORPORATION
ATTORNEYS & COUNSELORS   248-649-7800
1050 WILSHIRE DRIVE, SUITE 320, TROY, MICHIGAN 48084-1526

## **NOTICE OF REMOVAL**

To:  **THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT; EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

Defendant, Dick's Sporting Goods, Inc. ("Defendant"), by and through its attorneys, Harvey Kruse, P.C., hereby provides its notice to have the above action removed from state court to this District Court for the Eastern District of Michigan, Southern Division, stating as follows:

## THE STATE COURT ACTION

1.      An action involving the above parties is pending in the Wayne County Circuit Court for the State of Michigan, Case No. 24-013055-CP.

2.      The state court case was filed against Dick's Sporting Goods, Inc. and Dominique (**Exhibit 1**, Complaint).

3.      In his September 10, 2024 Complaint, Plaintiff asserts claims for Breach of Contract; Specific Performance and Violation of the Michigan Consumer Protection Act; Violation of the Michigan Shopping Reform and Modernization Act; Negligence and Fraud. (**Exhibit 1**).   Plaintiff's Complaint is predicated on allegations that following a failed January 2024 attempt to purchase certain gym equipment from Defendant and Plaintiff's complaint concerning the same, Defendant purportedly agreed to provide Plaintiff 75% off, plus an additional 25% off, any product or equipment that Plaintiff purchased for one (1) year with free shipping on all online orders, without limitation.   (**Exhibit 1**). Following the Plaintiff's efforts to purchase several items per this purported agreement, Defendant cancelled and/or rejected several items ordered by Plaintiff. Plaintiff alleges he attempted to order over $80,000.00 worth of merchandise and equipment but Defendant allegedly refused to comply with the alleged agreement. (**Exhibit 1**, ¶22).  Plaintiff is claiming damages for costs, attorney fees, expenses,

**HARVEY KRUSE**
ATTORNEYS & COUNSELORS     A PROFESSIONAL CORPORATION
1050 WILSHIRE DRIVE, SUITE 320, TROY, MICHIGAN 48084-1526  248-649-7800

lost profits, lost income, stress, anxiety and emotional distress.   (**Exhibit 1**).
Plaintiff's pre-suit demand was $150,000.00.  (**Exhibit 2**, demand letter).

<span style="font-variant:small-caps">**Federal Diversity Jurisdiction**</span>

4.     This is a "civil action" as defined by the removal statute, 28 USC
§1441. Removal is proper here because of diversity of citizenship of the parties.

5.     This action involves a controversy between citizens of different states
under 28 USC §1332(a)(1) and 28 USC §1332(c)(1), as shown below:

a.     Plaintiff is at the time of filing this Notice and was at the time
the state court action was filed, a resident of Wayne County,
State of Michigan (**Exhibit 1**, ¶1).  Plaintiff is therefore a
citizen of Michigan.

b.     Defendant, Dick's Sporting Goods, Inc., is at the time of the
filing this Notice, and was at the time the state court action was
filed, a Delaware corporation with its principal place of
business located at 345 Court St., Coraopolis, PA, 15108
(**Exhibit 3,** Certificate of Incorporation of Dick's Sporting
Goods, Inc.); and (**Exhibit 4**, Pennsylvania Department of State
website).  Defendant, Dick's Sporting Goods, Inc., is therefore
a citizen of Delaware and Pennsylvania.

HARVEY KRUSE   A PROFESSIONAL CORPORATION
ATTORNEYS & COUNSELORS   1050 WILSHIRE DRIVE, SUITE 320, TROY, MICHIGAN 48084-1526   248-649-7800

6.    While Plaintiff's Complaint pleads that the amount in controversy exceeds the sum of $25,000, the claimed injury and damages in **Exhibit 1** are at a minimum of $80,000.00 with the pre-suit demand of $150,000.00.  (**Exhibit 1**, ¶22; **Exhibit 2**, demand letter).   The damages here clearly exceed $75,000.00, exclusive of interest and costs.

7.    Defendant Dominique's full name is Dominque Perrone.  At the time of the filing of this Notice and was at the time the State Court action was filed a resident of Broussard, Louisiana.  (**Exhibit 5**, Ms. Perrone's Facebook page).  Ms. Perrone is therefore a citizen of Louisiana.

8.    As such, this Court has original subject matter jurisdiction over this action pursuant to 28 USC §1332 (a)(1) and 28 USC §1332 (c)(1), because of the diversity of the parties.

### PROCEDURAL REQUIREMENTS - 28 USC §1446

9.    Counsel for Defendant received the Summons and Complaint by email on September 10, 2024 (**Exhibit 6**, 9/10/24 email).  On September 24, 2024, counsel for Defendant acknowledged service of the Complaint.  (**Exhibit 7**, Acknowledgment of Service).

10.   As required under 28 USC §1446(b), this Notice of Removal is filed within 30 days of Defendant, Dick's Sporting Goods, Inc's, receipt of the initial pleading setting forth the claim on which this action is based.

4

11.    As required under 28 USC §1446(d), Defendant, Dick's Sporting Goods, Inc., is providing written notice to all adverse parties concerning its efforts to remove this case from state court.

12.    As required under 28 USC §1446(d), a copy of this Notice of Removal is being filed with the Wayne County Circuit Court.

13.    As required under 28 USC §1446(a), the Complaint and its proofs of service are attached herein, and no additional "process, pleadings, [or] orders" have been served upon this Defendant, Dick's Sporting Goods, Inc., in this action. (**Exhibit 1** and **Exhibit 7**).

14.    Defendant, Dick's Sporting Goods, Inc., has not filed an Answer to the Complaint in the state court and has taken no action whatsoever to actively defend itself in the state court or otherwise demonstrate a positive intent to litigate this case in that forum.

Respectfully submitted,

HARVEY KRUSE, P.C.

*/s/ John R. Prew*
John R. Prew (P41891)
Attorney for Defendant Dick's Sporting
1050 Wilshire Drive, Suite 320
Troy, MI 48084
(248) 649-7800
jprew@harveykruse.com

Dated: September 24, 2024

PROOF OF SERVICE

The Undersigned certifies that the forgoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on September 24, 2024 via

☐ US Mail                    ☐ Fax
☐ Hand Delivered             ☐ UPS
☐ Federal Express            ☒ E-File & Serve

Signature /s/Catherine A. Conti

**HARVEY KRUSE**

ATTORNEYS & COUNSELORS    A PROFESSIONAL CORPORATION
1050 WILSHIRE DRIVE, SUITE 320, TROY, MICHIGAN 48084-1526 248-649-7800

# EXHIBIT 1

24-013055-CP FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   9/10/2024 11:11 AM   Samiah Rahnuma

STATE OF MICHIGAN
IN THE WAYNE COUNTY CIRCUIT COURT

ANTHONY SACKETT

        Plaintiff

v.

DICK'S SPORTING GOODS, INC.
and DOMINIQUE

        Defendant

Case No. CP

Hon.

---

The Law Office of Ryan B. Stearn, P.C.
Ryan B. Stearn (P57897)
Attorney for the Plaintiff
29829 Greenfield Road, Ste 103
Southfield, MI 48076
(248) 213-7443
ryan@stearnlaw.com

---

## VERIFIED COMPLAINT

There is no other pending or resolved civil action arising out of the
transactions or occurrences alleged in this complaint

NOW COMES Plaintiff, Anthony Sackett, by and through his attorney, Ryan B. Stearn,

of the Law Office of Ryan B. Stearn, P.C., and for his complaint against Defendant, Dick's

Sporting Goods, Inc., states as follows:

1. Plaintiff is an individual who resides in the City of Allen Park, County of Wayne,

    State of Michigan.

2. Defendant, Dick's Sporting Goods, Inc. (Dicks) is a foreign profit corporation

    organized in the State of Delaware, which conducts business in the County of

    Wayne, State of Michigan.

1

3.     Defendant, Dominique, (Dominique) is an individual and agent of the Dicks, with authority, actual, inherent or apparent, to transact business on behalf of Dicks in the County of Wayne, State of Michigan.

4.     The transactions involved in this complaint occurred in the County of Wayne, State of Michigan.

5.     Plaintiff seeks damages in excess of TWENTY FIVE THOUSAND AND 00/100 ($25,000.00) DOLLARS, therefore, this Honorable Court has jurisdiction.

6.     The Plaintiff seeks equitable relief, therefore, this Honorable Court has jurisdiction.

## FACTS

7.     For all times relevant hereto, Plaintiff owned and operated a 9-Round Fitness franchise located in Plymouth, Michigan.

8.     For all times relevant hereto, Plaintiff was a personal trainer.

9.     Dicks advertised certain gym equipment (hereafter Gym Equipment) for sale at 75% off the retail price, at Dick's Canton Michigan location.

10.    On January 13, 2024, Plaintiff attempted to purchase the Gym Equipment from the Dick's Canton Michigan location.

11.    On January 13, 2024, Dicks represented to the Plaintiff that Gym Equipment was being held for a store employee and Dicks refused to sell the Gym Equipment to the Plaintiff for the advertised price. **(EXHIBIT 1).**

12.    At the time Plaintiff attempted to Purchase the Gym Equipment, the Gym Equipment was in stock.

2

13.    After Plaintiff was denied the opportunity to purchase the Gym Equipment, Plaintiff contacted Defendants to file a complaint against Defendant.  (**EXHIBIT 1).**

14.    In response to Plaintiff's complaint, Defendants agreed that it violated its own policy by refusing to sell the Gym Equipment to Plaintiff as advertised. **(EXHIBIT 1 - ).**

15.    On January 13, 2024, Defendants agreed to provide to Plaintiff 75% off plus an additional 25% off of any product or equipment that Plaintiff purchases from Dicks, plus free shipping.  **(EXHIBIT 1).**

16.    Pursuant to, and in reliance on, Defendants' offer; on January 19, 2024 Plaintiff ordered product and equipment from the Dicks.

17.    Dicks declined Plaintiff's January 19, 2024 order for product and equipment.

18.    As a result of Dick's refusal to sell the Gym Equipment to the Plaintiff on January 13, 2024, and in response to Dick's declining of Plaintiff's January 19, 2024 order, Defendants offered to provide the Plaintiff 75% off, plus an additional 25% off, of any and all purchases made by Plaintiff from Dicks for one (1) year, with free shipping on all online orders, without limitation (hereafter the Subject Agreement).  **(EXHIBIT 2).**

19.    Plaintiff accepted Defendants' offer, and ordered product and equipment from the Dicks.

20.    Shortly after Plaintiff placed his order with the Dicks, Dicks cancelled and/or rejected several items ordered by the Plaintiff.

21.     The remaining items ordered and purchased by the Plaintiff were delivered damaged, used, and/or not delivered at all.

22.     Pursuant to the Subject Agreement, Plaintiff attempted to order over $80,000.00 worth of merchandise and equipment from Dicks.

23.     On January 26, 2024, Dicks deleted Plaintiff's online cart, and refused to honor the Subject Agreement.  **(EXHIBIT 3).**

24.     From January to March 2024, Plaintiff spent nearly 12-hours on phone calls with, and/or attempting to contact Defendants, and countless hours of back and forth e-mails with Defendants, in an attempt to resolve Dick's violations of Michigan Law. **(EXHIBIT 4).**

25.     As a result of Dick's actions, including, but not limited to, Dick's refusal to honor its agreements, advertisements, and/or representations, Plaintiff was unable to work or serve his clients.

26.     As a result of Dick's actions, including, but not limited to, Dick's refusal to honor its agreements, advertisements, and/or representations, Plaintiff incurred substantial costs and expenses.

27.     As a result of Dick's actions, including, but not limited to, Dick's refusal to honor its agreements, advertisements, and/or representations, Plaintiff lost income and profits.

28.     As a result of Dick's actions, including, but not limited to, Dick's refusal to honor its agreements, advertisements, and/or representations, Plaintiff suffered and is being treated for stress, anxiety, and emotional distress.  **(EXHIBIT 5).**

4

29.    As a result of Dick's actions, including, but not limited to, Dick's refusal to honor

its agreements, advertisements, and/or representations, Plaintiff lost clients, gym

memberships, and profits.

## COUNT I

## BREACH OF CONTRACT AND SPECIFIC PERFORMANCE

30.    Plaintiff incorporates allegations contained in paragraphs 1-29 as fully stated

herein.

31.    Plaintiff and Dick's entered into an agreement whereby Dick's agreed to provide

to the Plaintiff 75% off, plus an additional 25% off, of any and all purchases made

by Plaintiff from Dicks for one year, with free shipping on all online orders,

without limitation (hereafter the Subject Agreement).  **(EXHIBIT 2).**

32.    Dicks breached the agreement by failing and refusing to honor Plaintiff's

purchases or provide to the Plaintiff the agreed discount.

33.    As a result of Dick's breach, Plaintiff was unable to work or serve his clients,

Plaintiff lost clients, Plaintiff incurred substantial costs and expenses, Plaintiff lost

income and profits, and Plaintiff suffered and is being treated for stress, anxiety,

and severe emotional distress.

34.    As a result of Dick's beach, Plaintiff has been damaged in excess of $25,000.00,

plus interest, costs an attorney's fees.

WHEREFORE, Plaintiff respectfully requests upon this Court to enter judgment in favor

of the Plaintiff and against the Dicks for damages in excess of $25,000.00, plus costs interest and

attorney's fees.

5

FURTHER, Plaintiff respectfully requests upon this Court to enter Judgment in favor of the Plaintiff ordering the Dicks to perform under the Subject Agreement and provide to the Plaintiff 75% off, plus an additional 25% off, of any and all purchases made by Plaintiff from Dicks for one (1) year, with free shipping on all online orders, without limitation.

## COUNT II

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT

35.    Plaintiff incorporates by reference allegations contained in paragraphs 1-34 as fully set forth herein.

36.    Dicks violated the Michigan Consumer Protection Act by engaging in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce as follows:

    a.  Dicks advertised or represented goods and services for sale with the intent not to dispose of the goods or services as advertised or represented.  (MCL 445.903(1)(g)).

    b.  Dicks Advertised goods or services with the intent not to supply reasonably expectable public demand.  (MCL 445.903(1)(h)).

    c.  Dicks made false or misleading statements of fact to the Plaintiff concerning the reasons for, existence of, or amounts of price reductions. (MCL 445.903(1)(i))

    d.  Dicks caused Plaintiff a probability of confusion or misunderstanding with respect to the authority of its salespersons, representatives, or agents to negotiate the final terms of a transaction.  (MCL 445.903(l)(m))

6

e.  Dicks caused a probability of confusion or misunderstanding as to the Plaintiff's legal rights, obligations, or remedies of the Plaintiff.  (MCL 445.903(l)(n)).

f.  Dicks represented or implied that the Plaintiff's consumer transactions would be provided promptly, at a specified time, or within a reasonable time, when the Dicks knew or should have known that it would not be provided.  MCL (445.903(1)(q)).

g.  Dicks failed to reveal material facts, the omission of which mislead and deceived the Plaintiff, and which the Plaintiff could not reasonably have known, including, but not limited to, (i) The authority of its salespersons, representatives and agents, and (ii) its policies and procedures.  (MCL 445.903(l)(s))

h.  Gross discrepancies between the oral representations of Dicks, and the written agreement between the parties and failure of Dicks to provide the benefits to the Plaintiff as promised.  (MCL 445.903(l)(y)).

i.  Dicks misrepresented that the Gym Equipment was sold or on hold; Dicks misrepresent that Dicks would provide to the Plaintiff discounts; Dicks misrepresented to the Plaintiff the authority of its salespersons, agents, and representatives such that the Plaintiff reasonably believed the misrepresentations.  (MCL 445.903(l)(bb) and MCL 445.903(1)(cc).

37.  As a result of Dicks' violations of the Michigan Consumer Protection Act, Plaintiff was unable to work or serve his clients, Plaintiff lost clients, Plaintiff incurred substantial costs and expenses, Plaintiff lost income and profits, and

7

Plaintiff suffered and is being treated for stress, anxiety, and severe emotional distress.

38.  As a result of Dicks' violations of the Michigan Consumer Protection Act, Plaintiff has been damaged in excess of $25,000.00, plus interest, costs an attorney's fees.

WHEREFORE, Plaintiff respectfully requests upon this Court to enter judgment in favor of the Plaintiff and against Dicks: (1) declaring that Dicks violated the Michigan Consumer Protection Act by engaging in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce; (2) for damages in excess of $25,000.00, plus costs, interest, and attorney's fees; and (3) ordering Dicks to perform under the Subject Agreement and provide to the Plaintiff 75% off, plus an additional 25% off, of any and all purchases made by Plaintiff from Dicks for one (1) year, with free shipping on all online orders, without limitation.

## COUNT III
## VIOLATION OF THE MICHIGAN
## SHOPPING REFORM AND MODERNIZATION ACT

39.  Plaintiff incorporates by reference allegations contained in paragraphs 1-38 as fully set forth herein.

40.  For all times relevant hereto, Dicks knowingly advertised consumer items for sale in violation of the Michigan Shopping Reform and Modernization Act by:

   a.  Failing to disclose a limitation on the Gym Equipment (MCL 445.314(1)(c).

   b.  Failing to provide the Plaintiff the products and merchandise as advertised and/or offered, a written guarantee, or items of equal or greater monetary value.  (MCL 445.314(3)).

8

41.     Dicks violated the Michigan Shopping Reform and Modernization Act by

knowingly making, publishing, disseminating, circulating, before the public an

advertisements that contain false, deceptive and misleading statements or

representations. (MCL 445.315(1)).

42.     Dicks intentionally violated the Michigan Shopping Reform and Modernization

Act by failing and refusing to sell goods and merchandise to the Plaintiff at the

price advertised and/or in accordance with the Defendants offer. (MCL

445.315(2)

43.     Dicks violated the Michigan Shopping Reform and Modernization Act by

making, publishing, disseminating, circulating, before the public advertisements

with the intent, design, or purpose not to sell the goods or merchandise to Plaintiff

as advertised and/or offered. (MCL 445.315(4))

WHEREFORE, Plaintiff respectfully requests upon this Court to enter judgment in favor

of the Plaintiff and against Dicks: (1) declaring that Dicks violated the Michigan Shopping

Reform and Modernization Act; (2) for damages in excess of $25,000.00, plus costs, interest, and

attorney's fees; and (3) ordering Dicks to perform under the Subject Agreement and provide to

the Plaintiff 75% off, plus an additional 25% off, of any and all purchases made by Plaintiff from

Dicks for one (1) year, with free shipping on all online orders, without limitation.

## COUNT IV
## NEGLIGENCE

44.     Plaintiff incorporates by reference allegations contained in paragraphs 1-43 as

fully set forth herein.

45.     For all times relevant hereto, Dicks had a duty to the Plaintiff the Gym Equipment

and other products and merchandise to the Plaintiff as advertised and offered.

9

46.     Dicks breached its duty by refusing and failing to sell to the Plaintiff the Gym
        Equipment and other products and merchandise to the Plaintiff as advertised and
        offered.

47.     As a result of Dicks' breach of duty, caused and proximately caused Plaintiff
        damages including, but not limited to, loss of discounts, loss of work, loss of
        income and profits, substantial costs and expenses, consequential damages, and
        stress, anxiety and emotional distress.

48.     As a result of Dicks' breach of duty, Plaintiff has suffered damages in excess of
        $25,000.00.

WHEREFORE, Plaintiff respectfully requests upon this Court to enter judgment in favor
of the Plaintiff and against Dicks: (1) declaring that Dicks violated the Michigan Shopping
Reform and Modernization Act; (2) for damages in excess of $25,000.00, plus costs, interest, and
attorney's fees; and (3) ordering Dicks to perform under the Subject Agreement and provide to
the Plaintiff 75% off, plus an additional 25% off, of any and all purchases made by Plaintiff from
Dicks for one (1) year, with free shipping on all online orders, without limitation.

## COUNT V
## FRAUD

49.     Plaintiff incorporates by reference allegations contained in paragraphs 1-47 as
        fully set forth herein.

50.     Dicks represented to the Plaintiff the availability of the Gym Equipment for sale.

51.     Defendants represented to the Plaintiff that Dicks would provide to the Plaintiff a
        discount on any products, goods and merchandise purchased by the Plaintiff for
        one (1) year.

10

52.   Dominique represented to the Plaintiff that Dominique had authority from Dicks to offer to Plaintiff the discounts on any products, goods and merchandise purchased by the Plaintiff for one (1) year.

53.   Defendants' representations were false when made.

54.   Defendants knew that their representations were false when made, recklessly, or without knowledge of its truth.

55.   Defendants made the misrepresentations with the intention that the Plaintiff would rely on the same.

56.   Plaintiff relied on Defendants' representations and purchased and attempted to purchase goods, merchandise and equipment from Dicks.

57.   Plaintiff relied on Defendants' representations and spent hours researching goods, merchandise and equipment offered by Dicks

58.   Plaintiff relied on Defendants' representations and forwent researching or purchasing goods, merchandise and equipment offered by any other person or entity.

59.   Plaintiff did not know, and could not have reasonably known that Defendants representations were false.

60.   Defendants' misrepresentation caused Plaintiff damages in excess of $25,000.00, including, but not limited to, loss of discounts, loss of work, loss of income and profits, substantial costs and expenses, consequential damages, pain and suffering, stress, anxiety and emotional distress, costs and attorney's fees

11

WHEREFORE, Plaintiff respectfully requests upon this Court to enter judgment in favor of the Plaintiff and against Defendants: (1) for damages in excess of $25,000.00, plus costs, interest, and attorney's fees.

I declare that the factual statements made herein are true and accurate to the best of my knowledge, information, and belief.

Dated: _8-29-2024_                                  _Anthony Sackett_
                                                    Anthony Sackett

Subscribed and sworn to me by Anthony Sackett, this ___29th___ day of August, 2024.

_Signature_
Notary Public
My commission expires 07/10/2026
Acting in the County of ~~Oakland~~ Wayne

DAVID SCARAMUCCI
Notary Public - State of Michigan
County of Wayne
My Commission Expires Jul 10, 2026
Acting in the County of Wayne

Respectfully submitted,

The Law Office of Ryan B. Stearn, P.C.

_Signature_
Ryan B. Stearn (P57897)
Attorney for the Plaintiff
29829 Greenfield Road, Ste 103
Southfield, MI  48076
(248) 213-7443

12

# EXHIBIT 1

**ryan stearnlaw.com**

| | |
|---|---|
| **From:** | Anthony <anthony.sackett01@gmail.com> |
| **Sent:** | Friday, August 9, 2024 8:25 PM |
| **To:** | ryan stearnlaw.com |
| **Subject:** | Fwd: Interaction GKFTGM |
| **Attachments:** | promo code.png; promo code.png |

IMPORTANT DOCS SHOWING PROOF OF OFFERS

## Forwarded Conversation
**Subject: Interaction GKFTGM**

-------------------------

From: DSG Support <support@ae.dickssportinggoods.com>
Date: Sat, Jan 13, 2024 at 5:35 PM
To: <anthony.sackett01@gmail.com>

Hello,

After discussing the incident that happened in the Canton, Michigan store on 1/13/2024, here is what we can do to make it right. I will be honoring the price of what you should have been able to get in store. If you make a purchase for an Inspire Fitness trainer gym unit, I will take 75% off the unit and then take an additional 25% off as well since the item you were going to buy was withheld by store associates so another employee could buy it. I will also get the shipping refunded as well. So, if the unit you purchase is $5000.00, 75% off of that would be approx. $3750 off of that which would bring it down to $1250. Another 25% off of $1250 would bring the unit down to approx. $938 give or take a little with tax. The shipping would be around $600 which would bring the total with shipping to approx. $1600.00. The shipping will be refunded but may take a couple of days to get that done. I have included a promo code that is good until Feb 12,2024 that will take $900.00 off when you place the order. I will adjust the rest after unit ships. All refunds will be processed after the unit ships because the system will not allow me to make an adjustment until then. Once you place an order reply back to this email with the order number and I will keep an eye on it to ship and email you as soon as I have been able to process a refund. Please let me know if you have any questions at any point. I can reach out and give you a call if you need me to!

Sincerely,
Dominique
Customer Service

1

# EXHIBIT 2

From: **DSG Support** <support@ae.dickssportinggoods.com>
Date: Fri, Jan 19, 2024 at 5:34 PM
To: <anthony.sackett01@gmail.com>

Hello,

After our call on **01/19/2024,** in reference to what had happened in store and the order we tried to place today, I am extending the same offer of **75%** and then additional **25%** with **free shipping** until **12/31/24** since we could not place such a large order all it once. This offer is in response to the situation that occurred in the **Canton, Michigan** store on **1/13/2024** where the item you were going to buy was withheld by store associates for over a month so another employee could buy it with their employee discount. Any order you are wanting to place thru-out the next year I will honor this promotion for you. This could have and should have been handled by the store but because they did not help make this

3

right, we will be taking care of this on our end. All refunds will be processed after the unit ships because the system will not allow me to make an adjustment until then. You can reply to this email at any point, and it will go directly to me. I can reach out and give you a call to help place an order at any point. If you place an order on your side let me know and I can credit the order with the above promotion. Please let me know if you have any questions at any point.

Sincerely,
Dominique
Customer Service
DICK'S Sporting Goods
1-877-846-9997

# EXHIBIT 3

----------

From: **DSG Support** <support@ae.dickssportinggoods.com>
Date: Fri, Jan 26, 2024 at 4:16 PM
To: <anthony.sackett01@gmail.com>

Hello Anthony,

I am following up on your order/interaction. Upon legal review we cannot recognize Dominique's unauthorized offer. She did not have authority to convey an offer of 75% off with an additional 25% on all orders through 2024. Such an open-ended offer far exceeds her contract authority granted by the company. We are willing to address your initial concerns relating to your desire to purchase the home gym by offering you a gift card equal to $5,000. We apologize for the confusion.

Sincerely,
Courtney
Customer Service
DICK'S Sporting Goods
1-877-846-9997

# EXHIBIT 4

Usage for:          7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:          2802 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 01/18/2024 4:44 | (860) 516-4706 | to Bristol/CT | 1 Min | -- |
| 01/18/2024 4:47 | (860) 516-4706 | Incoming | 8 Min | -- |
| 01/19/2024 12:0? | (860) 516-4706 | Incoming | 5 Min | Wi-Fi call |
| 01/19/2024 12:0? | (860) 516-4706 | Incoming | 75 Min | Wi-Fi call |
| 01/19/2024 4:08 | (860) 516-4706 | Incoming | 130 Min | -- |
| 01/19/2024 7:19 | (860) 516-4706 | Incoming | 100 Min | -- |
| 01/20/2024 5:15 | (860) 516-4706 | Incoming | 23 Min | Wi-Fi call |
| 01/22/2024 9:44 | (860) 516-4706 | to Bristol/CT | 6 Min | -- |
| 01/22/2024 1:43 | (860) 516-4706 | Incoming | 20 Min | -- |
| | | | 368 mins | |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:        7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:        2802 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 01/16/2024 6:37 | (877) 846-9997 | 1-877 | 10 Min | Wi-Fi call |
| 01/17/2024 1:12 | (877) 846-9997 | 1-877 | 10 Min | Wi-Fi call |
| 01/20/2024 5:09 | (877) 846-9997 | 1-877 | 14 Min | Wi-Fi call |
| 01/22/2024 9:31 | (877) 846-9997 | 1-877 | 1 Min | -- |
| 01/22/2024 9:36 | (877) 846-9997 | 1-877 | 1 Min | -- |
| 01/22/2024 9:43 | (877) 846-9997 | 1-877 | 4 Min | -- |
| 01/25/2024 12:35 | (877) 846-9997 | 1-877 | 15 Min | -- |
| 01/29/2024 1:33 | (877) 846-9997 | 1-877 | 1 Min | -- |
| 01/29/2024 3:29 | (877) 846-9997 | 1-877 | 12 Min | -- |
| 02/14/2024 11:41 | (877) 846-9997 | 1-877 | 3 Min | -- |
| 02/14/2024 11:45 | (877) 846-9997 | 1-877 | 20 Min | -- |
| | | | 91 mins | |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:          7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:          2802 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 02/07/2024 6:37 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 02/08/2024 10:1i | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/08/2024 10:1i | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/08/2024 11:3i | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/08/2024 2:21 | (248) 396-5763 | Incoming | 20 Min | -- |
| 02/14/2024 12:2i | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 02/14/2024 1:25 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| | | | 28 mins | |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:        7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:     3077 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 03/11/2024 1:26 | (877) 846-9997 | 1-877 | 58 Min | -- |
| 03/11/2024 2:37 | (877) 846-9997 | 1-877 | 24 Min | -- |
| | | | 82 mins | |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:          7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:      2457 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 01/13/2024 11:18 | (877) 846-9997 | 1-877 | 37 Min | -- |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:        7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:        3077 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 02/15/2024 9:27 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/15/2024 12:52 | (248) 396-5763 | Incoming | 25 Min | Wi-Fi call |
| 02/15/2024 3:34 | (248) 396-5763 | Incoming | 3 Min | Wi-Fi call |
| 02/19/2024 3:44 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/20/2024 9:32 | (248) 396-5763 | Incoming | 7 Min | Wi-Fi call |
| 02/21/2024 6:13 | (248) 396-5763 | to Pontiac/MI | 6 Min | -- |
| 02/22/2024 11:36 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/22/2024 12:04 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/22/2024 12:04 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/22/2024 1:23 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 02/22/2024 2:47 | (248) 396-5763 | to Pontiac/MI | 9 Min | -- |
| 02/22/2024 6:01 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/23/2024 12:18 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/23/2024 1:12 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/23/2024 1:20 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 02/26/2024 6:12 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/27/2024 9:43 | (248) 396-5763 | to Pontiac/MI | 1 Min | Wi-Fi call |
| 02/27/2024 3:39 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/28/2024 4:32 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/29/2024 1:11 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 02/29/2024 3:09 | (248) 396-5763 | Incoming | 8 Min | Wi-Fi call |
| 03/04/2024 5:45 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/04/2024 5:45 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 03/05/2024 5:00 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/06/2024 9:31 | (248) 396-5763 | to Pontiac/MI | 1 Min | Wi-Fi call |

| 03/06/2024 9:53 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
|---|---|---|---|---|
| 03/06/2024 12:4£ | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/06/2024 2:23 | (248) 396-5763 | Incoming | 10 Min | -- |
| 03/06/2024 3:50 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/06/2024 3:58 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/06/2024 6:54 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| | | | 96 min | |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:          7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:     3077 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 03/11/2024 1:26 | (877) 846-9997 | 1-877 | 58 Min | -- |
| 03/11/2024 2:37 | (877) 846-9997 | 1-877 | 24 Min | -- |
| | | | 82 mins | |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:        7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:        2802 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 01/18/2024 4:44 | (860) 516-4706 | to Bristol/CT | 1 Min | -- |
| 01/18/2024 4:47 | (860) 516-4706 | Incoming | 8 Min | -- |
| 01/19/2024 12:0; | (860) 516-4706 | Incoming | 5 Min | Wi-Fi call |
| 01/19/2024 12:0( | (860) 516-4706 | Incoming | 75 Min | Wi-Fi call |
| 01/19/2024 4:08 | (860) 516-4706 | Incoming | 130 Min | -- |
| 01/19/2024 7:19 | (860) 516-4706 | Incoming | 100 Min | -- |
| 01/20/2024 5:15 | (860) 516-4706 | Incoming | 23 Min | Wi-Fi call |
| 01/22/2024 9:44 | (860) 516-4706 | to Bristol/CT | 6 Min | -- |
| 01/22/2024 1:43 | (860) 516-4706 | Incoming | 20 Min | -- |
|  |  |  | 368 mins |  |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:          7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:          2457 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 01/13/2024 11:18 | (877) 846-9997 | 1-877 | 37 Min | -- |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:          7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:     3077 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 02/15/2024 9:27 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/15/2024 12:52 | (248) 396-5763 | Incoming | 25 Min | Wi-Fi call |
| 02/15/2024 3:34 | (248) 396-5763 | Incoming | 3 Min | Wi-Fi call |
| 02/19/2024 3:44 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/20/2024 9:32 | (248) 396-5763 | Incoming | 7 Min | Wi-Fi call |
| 02/21/2024 6:13 | (248) 396-5763 | to Pontiac/MI | 6 Min | -- |
| 02/22/2024 11:36 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/22/2024 12:04 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/22/2024 12:04 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/22/2024 1:23 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 02/22/2024 2:47 | (248) 396-5763 | to Pontiac/MI | 9 Min | -- |
| 02/22/2024 6:01 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/23/2024 12:16 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/23/2024 1:12 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/23/2024 1:20 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 02/26/2024 6:12 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/27/2024 9:43 | (248) 396-5763 | to Pontiac/MI | 1 Min | Wi-Fi call |
| 02/27/2024 3:39 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/28/2024 4:32 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/29/2024 1:11 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 02/29/2024 3:09 | (248) 396-5763 | Incoming | 8 Min | Wi-Fi call |
| 03/04/2024 5:45 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/04/2024 5:45 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 03/05/2024 5:00 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/06/2024 9:31 | (248) 396-5763 | to Pontiac/MI | 1 Min | Wi-Fi call |

| 03/06/2024 9:53 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/06/2024 12:46 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/06/2024 2:23 | (248) 396-5763 | Incoming | 10 Min | -- |
| 03/06/2024 3:50 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/06/2024 3:58 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 03/06/2024 6:54 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| | | | 96 min | |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:        7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:        2802 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 02/07/2024 6:37 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 02/08/2024 10:17 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/08/2024 10:16 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/08/2024 11:38 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
| 02/08/2024 2:21 | (248) 396-5763 | Incoming | 20 Min | -- |
| 02/14/2024 12:26 | (248) 396-5763 | to Pontiac/MI | 2 Min | -- |
| 02/14/2024 1:25 | (248) 396-5763 | to Pontiac/MI | 1 Min | -- |
|  |  |  | 28 mins |  |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

Usage for:          7349253914

LOCAL AIRTIME LONG DISTANCE and INTERNATIONAL CHARGES

Total use:       2802 minutes

| Date (Pacific) | Number | Destination | Minutes | Type |
|---|---|---|---|---|
| 01/16/2024 6:37 | (877) 846-9997 | 1-877 | 10 Min | Wi-Fi call |
| 01/17/2024 1:12 | (877) 846-9997 | 1-877 | 10 Min | Wi-Fi call |
| 01/20/2024 5:09 | (877) 846-9997 | 1-877 | 14 Min | Wi-Fi call |
| 01/22/2024 9:31 | (877) 846-9997 | 1-877 | 1 Min | -- |
| 01/22/2024 9:38 | (877) 846-9997 | 1-877 | 1 Min | -- |
| 01/22/2024 9:43 | (877) 846-9997 | 1-877 | 4 Min | -- |
| 01/25/2024 12:3 | (877) 846-9997 | 1-877 | 15 Min | -- |
| 01/29/2024 1:33 | (877) 846-9997 | 1-877 | 1 Min | -- |
| 01/29/2024 3:29 | (877) 846-9997 | 1-877 | 12 Min | -- |
| 02/14/2024 11:41 | (877) 846-9997 | 1-877 | 3 Min | -- |
| 02/14/2024 11:45 | (877) 846-9997 | 1-877 | 20 Min | -- |
| | | | 91 mins | |

The date and time for call usage corresponds with the time zone you are in when beginning a call.

# EXHIBIT 5



**LifeStance**
H E A L T H

20500 EUREKA RD STE 200
TAYLOR, MI 48180-6394
PHONE: (734) 285-8282  Fax: (734) 281-0402

To Whom It May Concern,

I am writing to confirm that my patient, Anthony Sackett, was seen on April 23, 2024. During this appointment, Anthony brought up concerns related to a situation with Dick's Sporting Goods where they did not honor their side of a deal they had made together. Anthony reported that this situation has been a significant contributing factor to the worsening of his mood and especially anxiety levels. Throughout our discussion, it was evident that the circumstances at Dick's Sporting Goods was causing Anthony considerable distress. Anthony expressed feelings of heightened anxiety and a noticeable decline in his overall mood directly linked to their experience with Dick's Sporting goods. The consistent theme of stress and anxiety related to this situation is the focal point in our treatment plan moving forward.

Sincerely,

Electronically Signed By: Zain Choudhry, MD

# EXHIBIT 2

# ATLAW™

April 18, 2024

**VIA USPS FIRST CLASS MAIL**

Dick's Sporting Goods
c/o Milton S. Karfis
Clark Kill
220 Park Street, Suite 200
Birmingham, MI 48009
mkarfis@clarkhill.com

   RE: Anthony Sackett vs. Dick's Sporting Goods

Dear Mr. Karfis:

My office has been retained by Anthony Sackett regarding a matter involving Dick's Sporting Goods ("Dick's"), for which you were previously representing the Dick's and were communicating with Mr. Sackett. Mr. Sackett has suffered and continues to suffer losses as a result of your client's actions.

I have taken the time to review all of the material in the file so that I can provide an analysis, from the plaintiff's point of view, as to what this case is all about. My hope is that by doing this, we can begin meaningful settlement negotiations with the idea of working out a resolution of the matter on a mutually amicable basis. If we did work out a settlement, this would really be helpful to both parties, in my view, because it would avoid lengthy and expensive litigation through the Wayne County Circuit Court or the U.S. District Court for the Eastern District of Michigan, and ultimately, if the case were not to be settled, the vagaries of a jury trial where no one can predict or control the result.

<u>FACTS</u>

In November or December 2023, Mr. Sackett was in the market to purchase equipment for his home gym and visited a Dick's Sporting Goods store in Canton, Michigan that was having a closeout sale intending to purchase gym equipment, if he found any good deals. Mr. Sackett found a home gym that was in-stock and advertised for 75% off. He asked a store associate about holding the home gym equipment until he was able to return with a vehicle and help to load and unload the equipment. The store associate made an affirmative representation that Dick's Sporting Goods had a policy that it would not hold any equipment and that Mr. Sackett would need to take the item at the time of purchase. Mr. Sackett left the store and promptly returned with help and a vehicle to purchase the equipment that he saw during his initial visit. Among other equipment, an Inspire FTE Functional Trainer with Bench was in stock and available for Mr. Sackett to purchase at that time at 75% off the manufacturer's recommended sales price. Mr. Sackett attempted to purchase this equipment at that time for the sale price; however, Dick's Sporting Goods refused to sell the item to Mr. Sackett because the item was purportedly sold. Mr. Sackett returned to the location

ATLAW™

several times over the course of two months to purchase the equipment, which continued to remain in-stock until the last day that the store location was open (on or about January 11, 2024). However, a manager named Kim and the store manager misrepresented to Mr. Sackett that he could not purchase the equipment because it was already sold to a store employee and refused to sell the item to Mr. Sackett. Despite the representation of the managers, Dick's Sporting Goods did not sell the item to the store employee until January 11, 2024. The terms of the said sale were that the employee received the 75% promotional sales price, plus an employee discount of 25% off. Consequently, Mr. Sackett was wrongfully denied the opportunity to purchase the equipment by Dick's Sporting Goods and its managers and employees.

Believing that he was wronged by this conduct, Mr. Sackett contacted customer service for Dick's Sporting Goods to report the issue. After several calls and long waits on hold, Mr. Sackett finally connected with a customer service representative named Dominique and discussed the issue. The customer service representative who had apparent authority to address Mr. Sackett's concerns, agreed that the store violated the company's policies and offered to resolve the dispute, Dominique offered Mr. Sackett the same discount that was given to the store employee (75% off, plus an additional 25% off) on any purchases for one year, with free shipping on all online orders, without limitation. Mr. Sackett accepted the offer and placed an order for equipment totaling over $6,000.00, that he purchased immediately. At that time, Mr. Sackett placed additional items in his cart, totaling $72,768.69, that he intended to purchase using the discount within 5 days of the initial order. (See attached itemized list.) Shortly after he placed the initial order, several items that Mr. Sackett ordered were unilaterally cancelled by Dick's Sporting Goods, under the claim that the items were out-of-stock, when they showed in-stock at the time of purchase. Other items that were delivered were damages or not in "new" condition, as advertised. One of the boxes that Mr. Sackett received was marked as exercise equipment that Mr. Sackett had ordered, but the box contained a woman's red dress, instead. The items Mr. Sackett had placed in his online cart were removed by Dick's Sporting Goods.

Mr. Sackett has suffered damages as a result of the above actions or failure to act on the part of Dick's Sporting Goods. Mr. Sackett is a business owner and operates a 9-Round Fitness franchise located in Plymouth, Michigan, in addition to working as a customer service specialist for Delta Airlines. Since he personally trains clients of the gym that he owns and operates, Mr. Sackett's own personal physical fitness is extremely important to him, which is why purchasing the equipment for his personal home gym is very important to him. Over the course of approximately two months (January through March 2024), Mr. Sackett spent nearly 12-hours (702 minutes) on phone calls with Dick's Sporting Goods or its agents attempting to resolve these issues. This caused Mr. Sackett to have to pay employees to cover shifts that he would normally have worked at his gym and impacted the time he was able to dedicate to his clients and marketing his business. Some clients canceled their memberships the gym because Mr. Sackett missed appointments with them or was unable to personally serve them.

# ATLAW™

The circumstances caused Mr. Sackett tremendous stress and anxiety, for which sought treatment with a psychiatrist, who prescribed Mr. Sackett anti-anxiety medication to treat his symptoms. Mr. Sackett was also not delivered the products that he ordered at the prices that he was promised by Dick's Sporting Goods. Dick's Sporting Goods also failed to perform on its promise that Mr. Sackett would be able to apply the offered discount of 75% off, plus an additional 25% off, with free shipping on his orders for one full year.

## MICHIGAN CONSUMER PROTECTION ACT

This Michigan Consumer Protection Act ("MCPA") prohibits retailers doing business in the State from engaging in unfair, unconscionable, or deceptive methods, acts, or practices when conducting trade. The MCPA is broader than common law torts of fraud inasmuch as it prohibits not only deceptive business practices but also those which are unfair and unconscionable. *Game On Ventures, Inc v General RV Center, Inc*, 587 F Supp 2d 831 (ED Mich, 2008). Practices that are prohibited under the MCPA includ the following acts:

- Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services. [MCL 445.903(1)(a)]
- Representing that goods are new if they are deteriorated, altered, reconditioned, used, or secondhand. [MCL 445.903(1)(d)]
- Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. [MCL 445.903(1)(e)]
- Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented. [MCL 445.903(1)(g)]
- Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity in immediate conjunction with the advertised goods or services. [MCL 445.903(1)(h)]
- Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions. [MCL 445.903(1)(i)]
- Causing a probability of confusion or of misunderstanding with respect to the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction. [MCL 445.903(1)(m)]
- Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction. [MCL 445.903(1)(n)]
- Representing or implying that the subject of a consumer transaction will be provided promptly, or at a specified time, or within a reasonable time, if the

# ΛTLΛW™

merchant knows or has reason to know it will not be so provided. [MCL 445.903(1)(q)]

- Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer. [MCL 445.903(1)(s)]
- Entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it. [MCL 445.903(1)(t)]
- Taking or arranging for the consumer to sign an acknowledgment, certificate, or other writing affirming acceptance, delivery, compliance with a requirement of law, or other performance, if the merchant knows or has reason to know that the statement is not true. [MCL 445.903(1)(v)]
- Representing that a consumer will receive a rebate, discount, or other benefit as an inducement for entering into a transaction, if the benefit is contingent on an event to occur subsequent to the consummation of the transaction. [MCL 445.903(1)(w)]
- Gross discrepancies between the oral representations of the seller and the written agreement covering the same transaction or failure of the other party to the transaction to provide the promised benefits. [MCL 445.903(1)(y)]
- Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold. [MCL 445.903(1)(z)]
- Causing coercion and duress as the result of the time and nature of a sales presentation. [MCL 445.903(1)(aa)]
- Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is. [MCL 445.903(1)(bb)]
- Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. [MCL 445.903(1)(cc)]

A single act may violate more than one subsection of the MCPA. *Zine v Chrysler Corp.*, 236 Mich App 261 (1999). Attorney's fees are available to a consumer who establishes a violation of the MCPA. *Mikos v Chrysler Corp*, 158 Mich App 783 (1987).

## MICHIGAN SHOPPING REFORM AND MODERNIZATION ACT

This Michigan Shopping Reform and Modernization Act ("MSRMA") establishes certain requirements for retail advertising of goods and services within the State and prohibits certain

# ATLAW™

types of advertising.  MCL 445.311, *et seq.*  Section 5 of the MSRMA also prohibits untrue, deceptive, or misleading advertising, prohibiting the following acts:

- knowingly making, publishing, disseminating, circulating, or placing before the public an advertisement that contains a statement or representation that is untrue, deceptive, or misleading [MCL 445.315(1)];
- failing to sell goods, merchandise, or commodities in the manner advertised, or refusing to sell at the price at which they are advertised or in accordance with other terms and conditions of the advertisement [MCL 445.315(2)];
- failing to reveal facts in advertising that are material in light of the representations made or suggested in a positive manner [MCL 445.315(3)];
- making, publishing, disseminating, circulating, or placing before the public an advertisement with the intent, design, or purpose not to sell the goods, merchandise, or commodities at the price stated in the advertisement or otherwise communicated, or with intent not to sell the goods, merchandise, or commodities included in the advertisement [MCL 445.315(4)]; or
- advertising, calling attention to, or giving publicity to the sale of goods, merchandise, or commodities that the person knows are not first class, without directly, unequivocally, and clearly indicating that the advertised goods, merchandise, or commodities are seconds or are blemished goods, merchandise, or commodities, or have been rejected by the manufacturer of the goods, merchandise, or commodities.

The MSRMA provides a private right of action for violations of the act.  MCL 445.911. Relief available includes reimbursement of damages suffered, injunctive relief to require an advertiser to carry out a transaction in accordance with the aggrieved persons' reasonable expectations, and other appropriate relief. MCL 445.911(5). The Michigan Attorney General may also bring action for violations of the MSRMA.  See MCL 445.910 and 912.

## SETTLEMENT DISCUSSION AND RECOMMENDATION

This matter involves several causes of action which provide clear liability on the party of Dick's Sporting Goods, including claims for clear breach of contract, fraud and/or misrepresentation, violations of the MCPA, and violations of the MSRMA by Dick's Sporting Goods, which resulted in clear injury to Mr. Sackett. We are unaware of whether this claim is covered under any liability insurance policy on the part of Dick's Sporting Goods. If it is covered, we request that you provide a copy of the insurance policy.

Under the MCPA, Mr. Sacket is entitled to recovery of his actual damages, plus attorney's fees. Damages may include damages for emotional distress and harm to Mr. Sackett's mental health. Mr. Sacket has treated with his mental health professional and paid fees associated with such treatment, including medical provider bills and costs of prescription medication. Mr. Sackett

# ATLAW™

has also lost time from work associated with the medical treatment and spending over 11-hours of time that he could have dedicated to running his company, which has resulted in a loss of business and having to pay employees to cover the time he would have dedicated to his clients.

In evaluating these types of cases, it is difficult to predict at what amount a jury in Wayne County would value the case. However, in effort to resolve the matter without the risks and expenses of litigation, Mr. Sackett is offering to settle his claims against your client for payment in the amount of $150,000 in full and complete satisfaction of his claims.

If we have missed anything in this letter, feel free to contact me, and I will do my best to supply the information that is necessary.  Please email me at nmh@atlawgroup.com to discuss potential resolution of this matter. If we do not hear from you within **fourteen (14) days** of the date of this letter, or **by May 2, 2024**, our client has authorized us to pursue his legal remedies.

Regards,

Nadia M. Hamade, Esq.

# EXHIBIT 3



# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "DICK'S CLOTHING & SPORTING GOODS, INC.", FILED IN THIS OFFICE ON THE TWENTY-FIFTH DAY OF NOVEMBER, A.D. 1996, AT 9 O`CLOCK A.M.

Jeffrey W. Bullock, Secretary of State

2687873  8100
SR# 20233878970

Authentication: 204625605
Date: 11-18-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 11/25/1996
960345013 — 2687873

# CERTIFICATE OF INCORPORATION

## OF

## DICK'S CLOTHING & SPORTING GOODS, INC.

The undersigned, a natural person, for the purpose of organizing a corporation for conducting the business and promoting the purposes hereinafter stated, under the provisions and subject to the requirements of the laws of the State of Delaware (particularly Chapter 1, Title 8 of the Delaware Code and the acts amendatory thereof and supplemental thereto, and known, identified, and referred to as the "General Corporation Law of the State of Delaware"), hereby certifies that:

1.     The name of the corporation (hereinafter called the "Corporation") is Dick's Clothing & Sporting Goods, Inc.

2.     The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware. This Corporation is not formed to engage in any act or activity for which approval by any state official, department, board, agency or other body is required.

Without limiting in any manner the scope and generality of the foregoing, it is hereby provided that the Corporation shall have the following purposes, objects and powers:

(a)     To acquire by subscription, purchase or otherwise, to hold for investment or for resale; to sell, pledge, hypothecate and in all ways deal with stocks, shares, script, bonds, debentures, mortgages, notes, trust receipts, certificates of indebtedness, interim receipts and other obligations and securities of corporations, private, interest and dividends on its holding and the principal thereof when due. To do all things suitable and proper for the protection, conservation or enhancement of the value of stocks, shares, securities, evidences of indebtedness or other properties held by it, including the exercise of the right to vote therein, to bid upon and purchase at foreclosure or at other sales, whether public or private, real property and rights in interests therein of all kinds.

(b)     To purchase, acquire, hold and dispose of the stocks, shares, bonds and other evidences of indebtedness of any corporation, domestic or foreign, and issue in exchange therefor its shares, bonds or other obligations.

(c)     To engage in capital ventures and business enterprises of every kind and description, whether as a promoter, partner, member, or associate, or as a manger of other such enterprises.

(d)     To manage and to provide management for and supervise all or part of any and every kind of investment or business enterprise, and to contract or arrange with any

corporation, association, partnership or individual for the management, conduct, operation and supervision of all kinds of investments and businesses.

(e)     To advertise, promote, merchandise and otherwise purvey the services authorized herein; to negotiate and contract with respect to furnishing of the same for or on behalf of any person, firm or corporation, domestic or foreign; to enter into and carry out agency or joint arrangements with other persons, firms or corporations engaged in like or similar activities; and generally to exploit the services and objects of the corporation by all lawful means.

(f)     To improve, manage, develop, sell, assign, transfer, lease, mortgage, pledge or otherwise dispose of or turn to account or deal with all or any part of the property of the Corporation and from time to time to vary any investment or employment of capital of the Corporation.

(g)     To borrow money, and to make and issue notes, bonds, debentures, obligations and evidences of indebtedness of all kinds, whether secured by mortgage, pledge or otherwise, without limit as to amount, and to secure the same by mortgage, pledge or otherwise; and generally to make and perform agreements and contracts of every kind and description.

(h)     To lend money for its corporate purposes, invest and reinvest its funds, and take, hold and deal with real and personal property as security for the payment of funds so loaned or invested.

(i)     To the same extent as natural persons might or could do, to purchase or otherwise acquire, and to hold, own, maintain, work, develop, sell, lease, exchange, hire, convey, mortgage or otherwise dispose of and deal in lands and leaseholds, and any interest, estate and rights in real property, and any personal or mixed property, and any franchises, rights, licenses or privileges necessary, convenient or appropriate for any of the purposes herein expressed.

(j)     To participate with others in any corporation, partnership, limited partnership, joint venture, or other association of any kind, or in any transaction, undertaking or arrangement which the participating corporation would have power to conduct by itself, whether or not such participation involves sharing or delegation of control with or to others; and to be an incorporator, promoter or manager of other corporations of any type or kind.

(k)     To pay pensions and establish and carry out pension, profit sharing, stock option, stock purchase, stock, bonus, retirement, benefit, incentive and commission plans, trusts and provisions for any or all of its directors, officers and employees of its subsidiaries; and to provide insurance for its benefits on the life of any of its directors, officers or employees, or on the life of any stockholder for the purpose of acquiring at his death shares of its stock owned by such stockholders.

(l)     To acquire by purchase, subscription or otherwise, and to hold for investment or otherwise and to use, sell, assign, transfer, mortgage, pledge or otherwise deal with or dispose of stocks, bonds or any other obligations or securities of any corporation or corporations; to merge or consolidate with any corporation in such manner as may be permitted by law; to aid in any manner as may be permitted by law; to aid in any manner any corporation whose stocks, bonds or other obligations are held or in any manner guaranteed by this Corporation, or in which this Corporation is in any way interested; and to do any other acts or things for the preservation, protection, improvement or enhancement of the value of any such stock, bonds or other obligations; and while owner of any such stock, bonds or other obligations to exercise all the rights, powers and privileges of ownership thereof, and to exercise any and all voting powers thereon; and to guarantee the payment of dividends upon any stock, the principal or interest or both, of any bonds or other obligations, and the performance of any contracts.

(m)     To do all and everything necessary, suitable and proper for the accomplishment of any of the purposes or the attainment of any of the objects or the furtherance of any of the powers hereinbefore set forth, either alone or in association with other corporations, firms or individuals, and to do every other act or acts, thing or things incidental or appurtenant to or growing out of or connected with the aforesaid business or powers or any part or parts thereof under the laws of the State of New York now or hereafter applicable to the Corporation.

The purposes and powers specified in the clauses contained in this Article 2 shall, except when otherwise expressed in this Article 2, be in no wise limited or restricted by reference to, or inference from, the terms of any other clause of this or of any other article of this Certificate, but the purposes and powers specified in each of the clauses of this Article 2 shall be regarded as independent purposes and powers, and the specifications herein contained of particular power of the Corporation is not intended to be, and is not, in limitation of, but is in furtherance of, the power granted to corporations under the laws of the State of Delaware under and in pursuance of the provisions of which the Corporation is formed.

3.     The address, including street, number, city, and county, of the registered office of the corporation in the State of Delaware is 1013 Centre Road, City of Wilmington 19805, County of New Castle, and the name of the registered agent of the corporation in the State of Delaware at such address is Corporation Service Company.

4.     Authorized Stock.

(a)     The aggregate number of shares which the Corporation shall have the authority to issue is 20,000,000 shares of Common Stock with a par value of one cent ($.01) per share; and 12,516,771 shares of Preferred Stock with a par value of one cent ($.01) per share, of which 1,062,095 shares shall be designated Series A Convertible Preferred Stock (the "Series A Preferred Stock"), 1,708,242 shall be designated as Series B Convertible Preferred Stock (the "Series B Preferred Stock"), 1,172,996 shall be designated as Series C Convertible Preferred Stock (the "Series C Preferred Stock"), 1,558,372 shall be designated as Series D Convertible

Preferred Stock (the "Series D Preferred Stock"), 4,407,260 shall be designated as Series E Convertible Preferred Stock (the "Series E Preferred Stock"), 1,509,400 shall be designated as Series F Convertible Preferred Stock (the "Series F Preferred Stock") and 1,098,406 designated as Series G Convertible Preferred Stock (the "Series G Convertible Preferred Stock"). For the purposes hereof, the Series A Preferred Stock, the Series B Preferred Stock, the Series C Preferred Stock, Series D Preferred Stock, the Series E Preferred Stock, the Series F Preferred Stock and the Series G Convertible Preferred Stock are sometimes hereinafter collectively referred to as the "Preferred Stock."

(b)     Intentionally Omitted

(c)     The voting powers, preferences and rights (and the qualifications, limitations, or restrictions thereof) of the Preferred Stock are as follows:

1.     Voting.

1A. General. Except as may be otherwise provided in these terms of the Preferred Stock or by law, the Preferred Stock shall vote together with all other classes and series of stock of the Corporation as a single class on all actions to be taken by the stockholders of the Corporation. Each share of Preferred Stock shall entitle the holder thereof to such number of votes per share on each such action as shall equal the number of shares of Common Stock (including fractions of a share) into which each share of Preferred Stock is then convertible.

1B. Board Size. Subject to the provisions of paragraph 1C below, the Corporation shall not, without the written consent or affirmative vote of the holders of at least sixty-five percent (65%) in interest of the then outstanding shares of Series A Preferred Stock, Series C Preferred Stock and Series E Preferred Stock, in each case given in writing or by vote at a meeting, consenting or voting (as the case may be) together as one class, increase the maximum number of directors constituting the Board of Directors to a number in excess of nine.

1C. Board Seats. (1) The holders of the Series A Preferred Stock, voting as a separate series, shall be entitled to elect two (2) directors of the Corporation. At any meeting (or in a written consent in lieu thereof) held for the purpose of electing directors, the presence in person or by proxy (or the written consent) of the holders of at least sixty six and two-thirds percent (66-2/3%) in interest of the then outstanding shares of Series A Preferred Stock shall constitute a quorum of the Series A Preferred Stock for the election of directors to be elected solely by the holders of the Series A Preferred Stock. A vacancy in any directorship elected by the holders of the Series A Preferred Stock shall be filled only by vote or written consent of sixty six and two thirds percent (66-2/3%) in interest of the holders of the Series A Preferred Stock.

(2)     The holders of the Common Stock and Series B Preferred Stock, voting as one class and as a separate series, shall be entitled to elect two (2)

-4-

directors of the Corporation.  At any meeting (or in a written consent in lieu thereof) held for the purpose of electing directors, the presence in person or by proxy (or the written consent) of the holders of at least a majority in interest of the then outstanding shares of Common Stock and Series B Preferred Stock, voting as one class, shall constitute a quorum of the Common Stock and Series B Preferred Stock for the election of directors to be elected solely by the holders of the Common Stock and Series B Preferred Stock.  A vacancy in any directorship elected by the holders of the Common Stock and Series B Preferred Stock shall be filled only by vote or written consent of a majority in interest of the holders of the Common Stock and Series B Preferred Stock voting as one class.

(3)     The holders of the Series C Preferred Stock, voting as a separate series, shall be entitled to elect one (1) director of the Corporation.  At any meeting (or in a written consent in lieu thereof) held for the purpose of electing directors, the presence in person or by proxy (or the written consent) of the holders of at least fifty five percent (55%) in interest of the then outstanding shares of Series C Preferred Stock shall constitute a quorum of the Series C Preferred Stock for the election of directors to be elected solely by the holders of the Series C Preferred Stock.  A vacancy in any directorship elected by the holders of the Series C Preferred Stock shall be filled only by vote or written consent of fifty five percent (55%) in interest of the holders of the Series C Preferred Stock.

(4)     The holders of the Series D Preferred Stock, voting as a separate series, shall not be entitled to elect any directors of the Corporation unless and until no Series C Preferred Stock is outstanding due to a redemption or other corporate transaction, at which time the holders of the Series D Preferred Stock, voting as a separate series, shall succeed to the right of the holders of the Series C Preferred Stock to elect one (1) director of the Corporation.  At any meeting (or in a written consent in lieu thereof) held for the purpose of electing directors at a time at which there is no Series C Preferred Stock outstanding, the presence in person or by proxy (or the written consent) of the holders of at least sixty six and two-thirds percent (66-2/3%) in interest of the then outstanding shares of Series D Preferred Stock shall constitute a quorum of the Series D Preferred Stock for the election of directors to be elected solely by the holders of the Series D Preferred Stock.  A vacancy in any directorship elected by the holders of the Series D Preferred Stock shall be filled only by vote or written consent of sixty six and two-thirds percent (66-2/3%) in interest of the holders of the Series D Preferred Stock.

(5)     The holders of the Series E Preferred Stock, voting as a separate series, shall be entitled to elect one (1) director of the Corporation.  At any meeting (or in a written consent in lieu thereof) held for the purpose of electing directors, the presence in person or by proxy (or the written consent) of the holders of at least a majority in interest of the then outstanding shares of Series E Preferred Stock shall constitute a quorum of the Series E Preferred Stock for the election of directors to be elected solely by the holders of the Series E Preferred Stock.  A vacancy in any directorship elected by the holders of the Series E Preferred

Stock shall be filled only by vote or written consent of a majority in interest of the holders of the Series E Preferred Stock.

(6)     The directors of the Corporation elected in accordance with the provisions of paragraph 4(c)(1C)(1) through (5) (the "Designated Directors") shall be entitled to elect three (3) directors of the Corporation. At any meeting (or in a written consent in lieu thereof) held for the purpose of electing such directors, the three directors shall be elected by the majority vote of the Designated Directors. A vacancy in any directorship elected by the Designated Directors shall be filled only by vote or written consent of the majority of the Designated Directors.

(7)     The holders of the Series F Preferred Stock and the holders of the Series G Convertible Preferred Stock shall not be entitled to elect or otherwise to vote upon the election of any directors of the Corporation.

2.     <u>Dividends</u>

2A. <u>Dividends</u>. The consent of holders of (1) sixty six and two-thirds percent (66-2/3%) in interest of the then outstanding shares of Series A Preferred Stock and (2) fifty five percent (55%) in interest of the then outstanding shares of Series C Preferred Stock and (3) sixty six and two-thirds percent (66 ⅔%) in interest of the then outstanding shares of Series D Preferred Stock and (4) a majority in interest of the then outstanding shares of Series E Preferred Stock and (5) a majority in interest of the then outstanding shares of Series F Preferred Stock and (6) a majority in interest of the then outstanding shares of Series G Convertible Preferred Stock, shall be received by the Corporation, before any dividends shall be declared and paid upon or set aside for the Common Stock or the Series B Preferred Stock of the Corporation in any year. All dividends declared upon the Series A Preferred Stock, the Series C Preferred Stock, the Series D Preferred Stock, the Series E Preferred Stock, the Series F Preferred Stock and the Series G Preferred Stock shall be declared and paid upon or set aside pro rata per share based upon the original issue price for each share of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock.

2B. <u>Accruing Dividends</u>. From and after the date of the original issuance of each share of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and the Series F Preferred Stock, the holders of the Series A Preferred Stock, the Series C Preferred Stock, the Series D Preferred Stock, the Series E Preferred Stock, the Series F Preferred Stock and the Series G Preferred Stock, shall be entitled to receive, out of funds legally available therefor, when and if declared by the Board of Directors, dividends at the rate per annum of $.612 per share in respect of the Series A Preferred Stock, $1.16 per share in respect of the Series C Preferred Stock, $1.76 per share in respect of the Series D Preferred Stock and, except as provided in paragraph 4(c)(7D), $.80 per share in respect of the Series E Preferred Stock, $.80 per share in respect of the Series F Preferred Stock, and $.80 per

-6-

share in respect of the Series G Preferred Stock (collectively, the "Accruing Dividends"). Accruing Dividends shall accrue from day to day, whether or not earned or declared, and shall be cumulative; provided however, that except as provided in paragraphs 4(c)(3) and 4(c)(6), the Corporation shall be under no obligation to pay such Accruing Dividends currently unless so declared by the Board of Directors, and provided, further, that no dividends shall be declared or paid to the holders of the Series B Preferred Stock or Common Stock unless and until all Accruing Dividends have been paid in full.

2C. Special Accruing Dividends. From and after the date of the original issuance of each share of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock (and in addition to the Accruing Dividends described above), the holders of the Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock, respectively, shall be entitled to receive, out of funds legally available therefor, when and if declared by the Board, dividends (the "Special Accruing Dividends") at a rate per annum in an amount per share which, when combined with the Accruing Dividends, would provide each holder of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock with a 10% compounded return on the original issue price of $7.65 per share in the case of the Series A Preferred Stock, on the original issue price of $14.50 in the case of the Series C Preferred Stock, on the original issue price of $22.00 in the case of the Series D Preferred Stock and, except as provided in paragraph 4(c)(7D), on the original issue price of $10.00 in the case of the Series E Preferred Stock, and on the original issue price of $10.00 in the case of the Series F Preferred Stock and the Series G Preferred Stock (in each case calculated from the date of original issuance). Special Accruing Dividends shall accrue from day to day, whether or not earned or declared, and shall be cumulative; provided, however, that except as provided in paragraph 4(c)(6B), the Corporation shall be under no obligation to pay such Special Accruing Dividends currently unless so declared by the Board of Directors, and provided, further, that no dividends shall be declared or paid to the holders of the Series B Preferred Stock or Common Stock unless and until all Special Accruing Dividends have been paid in full.

3.  Liquidation, Dissolution and Winding-up.

3A.  Liquidation.

(1)  Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the shares of Series A Preferred Stock shall be paid an amount equal to $7.65 per share plus, in the case of each share, an amount equal to dividends (consisting only of Accruing Dividends) accrued but unpaid thereon, computed to the date payment thereof is made available, together with payment to any class of stock ranking equally with the Series A Preferred Stock, and before any payment shall be made to the holders of any stock ranking on liquidation junior to the Series A Preferred Stock, such amount payable with respect to one share of Series A Preferred Stock being sometimes referred to as the "Series A

Liquidation Preference Payment" and with respect to all shares of Series A Preferred Stock being sometimes referred to as the "Series A Liquidation Preference Payments".

(2)     Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the shares of Series C Preferred Stock shall be paid an amount equal to $14.50 per share plus, in the case of each share, an amount equal to dividends (consisting only of Accruing Dividends) accrued but unpaid thereon, computed to the date payment thereof is made available, together with payment to any class of stock ranking equally with the Series C Preferred Stock, and before any payment shall be made to the holders of any stock ranking on liquidation junior to the Series C Preferred Stock, such amount payable with respect to one share of Series C Preferred Stock being sometimes referred to as the "Series C Liquidation Preference Payment" and with respect to all shares of Series C Preferred Stock being sometimes referred to as the "Series C Liquidation Preference Payments".

(3)     Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the shares of Series D Preferred Stock shall be paid an amount equal to $22.00 per share plus, in the case of each share, an amount equal to dividends (consisting only of Accruing Dividends) accrued but unpaid thereon, computed to the date payment thereof is made available, together with payment to any class of stock ranking equally with the Series D Preferred Stock, and before any payment shall be made to the holders of any stock ranking on liquidation junior to the Series D Preferred Stock, such amount payable with respect to one share of Series D Preferred Stock being sometimes referred to as the "Series D Liquidation Preference Payment" and with respect to all shares of Series D Preferred Stock being sometimes referred to as the "Series D Liquidation Preference Payments".

(4)     Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the shares of Series E Preferred Stock shall be paid, except as provided in paragraph 4(c)(7D), an amount equal to $10.00 per share plus, in the case of each share, an amount equal to dividends (consisting only of Accruing Dividends) accrued but unpaid thereon, computed to the date payment thereof is made available, together with payment to any class of stock ranking equally with the Series E Preferred Stock, and before any payment shall be made to the holders of any stock ranking on liquidation junior to the Series E Preferred Stock, such amount payable with respect to one share of Series E Preferred Stock being sometimes referred to as the "Series E Liquidation Preference Payment" and with respect to all shares of Series E Preferred Stock being sometimes referred to as the "Series E Liquidation Preference Payments".

(5)     Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the shares of Series F Preferred Stock shall be paid an amount equal to $10.00 per share plus, in the case of each share, an amount equal to dividends (consisting only of Accruing Dividends) accrued but unpaid thereon, computed to the date payment thereof is made available, together with payment to any class of stock ranking equally with the Series F Preferred Stock, and before any payment shall be made to the holders of

any stock ranking on liquidation junior to the Series F Preferred Stock, such amount payable with respect to one share of Series F Preferred Stock being sometimes referred to as the "Series F Liquidation Preference Payment" and with respect to all shares of Series F Preferred Stock being sometimes referred to as the "Series F Liquidation Preference Payments".

(6)     Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the shares of Series G Preferred Stock shall be paid an amount equal to $10.00 per share plus, in the case of each share, an amount equal to dividends (consisting only of Accruing Dividends) accrued but unpaid thereon, computed to the date payment thereof is made available, together with payment to any class of stock ranking equally with the Series G Preferred Stock, and before any payment shall be made to the holders of any stock ranking on liquidation junior to the Series G Preferred Stock, such amount payable with respect to one share of Series G Preferred Stock being sometimes referred to as the "Series G Liquidation Preference Payment" and with respect to all shares of Series G Preferred Stock being sometimes referred to as the "Series G Liquidation Preference Payments".

(7)     If upon any liquidation, dissolution, or winding up of the Corporation, the assets to be distributed to the holders of the Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock shall be insufficient to permit payment to such stockholders of the full preferential amounts aforesaid, then all of the assets of the Corporation shall be distributed to such holders of the Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock pro rata, so that each holder receives that portion of the assets available for distribution as the liquidation preference payment amounts for the shares of Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock held by such holder bear to the aggregate liquidation preference payment amounts for all shares of Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock then outstanding.  If upon any liquidation, dissolution, or winding up of the Corporation, the full preferential amounts aforesaid are paid to the holders of the Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock, but the assets to be distributed to the holders of the Series A Preferred Stock, the Series C Preferred Stock and the Series D Preferred Stock shall be insufficient to permit payment to such stockholders of the full preferential amounts aforesaid, then all of the assets of the Corporation remaining after the full liquidation preference payment amounts are paid to the holders of the Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock shall be distributed to such holders of the Series A Preferred Stock, the Series C Preferred Stock and the Series D Preferred Stock pro rata, so that each holder receives that portion of the assets available for distribution as the liquidation preference payment amounts for the shares of Series A Preferred Stock, Series C Preferred Stock and/or Series D Preferred Stock held by such holder bear to the aggregate liquidation preference payment amounts for all shares of Series A Preferred Stock, Series C Preferred Stock and Series D Preferred Stock then outstanding.

3B.  Ranking.  Upon any liquidation, dissolution or winding up of the Corporation, immediately after the holders of Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock shall have been paid the Series E Liquidation Preference

Payments, the Series F Liquidation Preference Payments and the Series G Liquidation Preference Payments in full, the remaining net assets of the Corporation available for distribution shall be distributed as follows: (i) first, to the holders of Series A Preferred Stock, Series C Preferred Stock and Series D Preferred Stock, the Series A Liquidation Preference Payments, the Series C Liquidation Preference Payments, and the Series D Liquidation Preference Payments; (ii) second, to the holders of the shares of Series B Preferred Stock (pro rata in proportion to their respective holdings should there be insufficient assets to pay the full amount) an amount equal to the amount received by the Corporation upon the original issuance of the underlying shares of Old Preferred Stock, and (iii) if there shall be any assets remaining, among the holders of the shares of Preferred Stock and Common Stock in an amount per share as would have been payable had each share of Preferred Stock been converted to Common Stock pursuant to paragraph 4(c)(5) immediately prior to such liquidation, dissolution or winding up.

            3C. <u>Notice and Special Provisions</u>. Written notice of any such liquidation, dissolution or winding up, stating a payment date and the place where said payments shall be made, shall be given by mail, postage prepaid, or by telex or facsimile transmission to non-U.S. residents, not less than 30 days prior to the payment date stated therein, to the holders of record of Preferred Stock, such notice to be addressed to each such holder at its address as shown by the records of the Corporation. The consolidation or merger of the Corporation into or with any other entity or entities which results in the exchange of outstanding shares of the Corporation for securities or other consideration issued or paid or caused to be issued or paid by any such entity or affiliate thereof, and the sale or transfer by the Corporation of more than fifty-five percent (55%) of its assets (such consolidation or merger, or sale or transfer, being herein referred to as a "Sale of the Corporation"), shall be deemed to be a liquidation, dissolution or winding up of the Corporation within the meaning of the provisions of this paragraph 4(c)(3) and paragraph 4(c)(7) hereof, <u>provided</u>, however, that each holder of Preferred Stock shall have the right to elect the benefits of the provisions of paragraph 4(c)(5G) in lieu of receiving payment in liquidation, dissolution or winding up of the Corporation pursuant to this paragraph 4(c)(3), and <u>provided</u>, <u>further</u>, however, (1) if the consideration per share to be received by the holders of the Series A Preferred Stock upon such Sale of the Corporation (as determined in good faith by the Corporation's Board of Directors in accordance with the provisions of paragraph 4(c)(3E) hereof) is equal to or greater than two times the original issue price per share of the Series A Preferred Stock (as adjusted for any stock split, subdivision, reclassification or similar event), no liquidation, dissolution or winding up of the Corporation within the meaning of the provisions of this paragraph 4(c)(3) shall be deemed to have occurred with respect to the holders of the Series A Preferred Stock, and the provisions of paragraph 4(c)(5G) shall apply, and (2) if the consideration per share to be received by the holders of the Series C Preferred Stock upon such Sale of the Corporation (as determined in good faith by the Corporation's Board of Directors) is equal to or greater than two times the original issue price per share of the Series C Preferred Stock (as adjusted for any stock split, subdivision, reclassification or similar event), no liquidation, dissolution or winding up of the Corporation within the meaning of the provisions of this paragraph 4(c)(3) shall be deemed to have occurred with respect to the holders of the Series C Preferred Stock, and the provisions of paragraph 4(c)(5G) shall apply, and (3) if the consideration

per share to be received by the holders of the Series D Preferred Stock upon such Sale of the Corporation (as determined in good faith by the Corporation's Board of Directors) is equal to or greater than two times the original issue price per share of the Series D Preferred Stock (as adjusted for any stock split, subdivision, reclassification or similar event), no liquidation, dissolution or winding up of the Corporation within the meaning of the provisions of this paragraph 4(c)(3) shall be deemed to have occurred with respect to the holders of the Series D Preferred Stock, and the provisions of paragraph 4(c)(5G) shall apply, and (4) if the consideration per share to be received by the holders of the Series E Preferred Stock upon such Sale of the Corporation (as determined in good faith by the Corporation's Board of Directors) is equal to or greater than two times the original issue price per share of the Series E Preferred Stock (as adjusted for any stock split, subdivision, reclassification or similar event), no liquidation, dissolution or winding up of the Corporation within the meaning of the provisions of this paragraph 4(c)(3) shall be deemed to have occurred with respect to the holders of the Series E Preferred Stock, and the provisions of paragraph 4(c)(5G) shall apply, and (5) if the consideration per share to be received by the holders of the Series F Preferred Stock upon such Sale of the Corporation (as determined in good faith by the Corporation's Board of Directors) is equal to or greater than two times the original issue price per share of the Series F Preferred Stock (as adjusted for any stock split, subdivision, reclassification or similar event), no liquidation, dissolution or winding up of the Corporation within the meaning of the provisions of this paragraph 4(c)(3) shall be deemed to have occurred with respect to the holders of the Series F Preferred Stock, and the provisions of paragraph 4(c)(5G) shall apply, and (6) if the consideration per share to be received by the holders of the Series G Preferred Stock upon such Sale of the Corporation (as determined in good faith by the Corporation's Board of Directors) is equal to or greater than two times the original issue price per share of the Series G Preferred Stock (as adjusted for any stock split, subdivision, reclassification or similar event), no liquidation, dissolution or winding up of the Corporation within the meaning of the provisions of this paragraph 4(c)(3) shall be deemed to have occurred with respect to the holders of the Series G Preferred Stock, and the provisions of paragraph 4(c)(5G) shall apply, provided further, however, that the provisions of paragraph 4(c)(3D) shall apply and the Series E Preferred Stock, the Series F Preferred Stock and the Series G Preferred Stock shall be senior to all other classes of stock of the Corporation. With respect to any distribution hereunder, including dividends, and upon redemption and liquidation, such distribution shall be made in accordance with the provisions of paragraph 4(c)(3D) below.

### 3D. Relative Rights of Holders.

(1) For purposes hereof, the Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock shall rank pari passu for all purposes, including dividends, redemption and liquidation.

(2) For purposes hereof, the Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock shall be senior for all purposes, including dividends, redemption and liquidation, to all other classes of stock of the Corporation, including

without limitation, the Series A Preferred Stock, the Series B Preferred Stock, the Series C Preferred Stock, the Series D Preferred Stock and the Common Stock.

        (3)    For purposes hereof, the Series A Preferred Stock, the Series C Preferred Stock and Series D Preferred Stock shall rank pari passu for all purposes, including dividends, redemption and liquidation. The Series B Preferred Stock and Common Stock shall rank on liquidation junior to the Series A Preferred Stock, the Series C Preferred Stock, and the Series D Preferred Stock.

        3E.  Valuation of Consideration. Upon any liquidation, dissolution or winding up of the Corporation, if the consideration received by the Corporation and/or the holders of its capital stock is other than cash, the value of such consideration for purposes of this paragraph 4(c)(3) shall be deemed its fair market value, as determined in good faith by the Corporation's Board of Directors. Any securities shall be valued as follows:

        (1)    Securities not subject to an investment letter or other similar restrictions on free marketability covered by paragraph 4(c)(3E)(2) below:

        (a)    If traded on a securities exchange or through the Nasdaq National Market tier of The Nasdaq Stock Market, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty-day period ending three (3) days prior to the date of the liquidation, dissolution or winding up event; and

        (b)    If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the thirty-day period ending three (3) days prior to the date of the liquidation, dissolution or winding up event; and

        (c)    If there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the Corporation's Board of Directors.

        (2)    The method of valuation of securities subject to an investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a shareholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined in accordance with paragraph 4(c)(3E)(1) to reflect the approximate fair market value thereof, as determined in good faith by the Corporation's Board of Directors.

        4.    Restrictions.

        4A.  Special Votes of Series A Preferred Stock. At any time when shares of Series A Preferred Stock are outstanding, except where the provisions of paragraph

4(c)(4G) apply or where the vote or written consent of the holders of a greater number of shares of the Series A Preferred Stock of the Corporation is required by law or by the Certificate of Incorporation, and in addition to any other vote required by law or the Certificate of Incorporation (except that if the provisions of paragraph 4(c)(4G) apply, the vote hereunder shall not be required), without the written consent of the holders of at least sixty six and two-thirds percent (66-2/3%) in interest of the then outstanding shares of Series A Preferred Stock given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a series, the Corporation will not:

(1)     Amend, alter or repeal any provision of its Certificate of Incorporation which (a) increases the authorized number of shares of Preferred Stock, or (b) increases (by more than 5% in the aggregate) the number of shares of authorized capital stock of the Corporation;

(2)     Create or authorize the creation of any additional class or series of shares of stock unless the same ranks junior to the Series A Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or increase the authorized amount of Series A Preferred Stock or increase the authorized amount of any additional class or series of shares of stock unless the same ranks junior to the Series A Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or create or authorize any obligation or security convertible into shares of Series A Preferred Stock or into shares of any other class or series of stock unless the same ranks junior to the Series A Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, whether any such creation, authorization or increase shall be by means of amendment to the Certificate of Incorporation or by merger, consolidation or otherwise; or

(3)     In any manner amend, alter or change the designations or the powers, preferences or rights, privileges or the restrictions of the Series A Preferred Stock materially or adversely, including the voting rights of such stock.

4B.   Special Votes of Series C Preferred Stock.   At any time when shares of Series C Preferred Stock are outstanding, except where the provisions of paragraph 4(c)(4G) apply or where the vote or written consent of the holders of a greater number of shares of the Series C Preferred Stock of the Corporation is required by law or by the Certificate of Incorporation, and in addition to any other vote required by law or the Certificate of Incorporation (except that if the provisions of paragraph 4(c)(4G) apply, the vote hereunder shall not be required), without the written consent of the holders of at least fifty-five percent (55%) in interest of the then outstanding shares of Series C Preferred Stock given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a series, the Corporation will not:

(1)     Amend, alter or repeal any provision of its Certificate of Incorporation which (a) increases the authorized number of shares of Preferred

-13-

Stock, or (b) increases (by more than 5% in the aggregate) the number of shares of authorized capital stock of the Corporation;

(2)     Create or authorize the creation of any additional class or series of shares of stock unless the same ranks junior to the Series C Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or increase the authorized amount of Series C Preferred Stock or increase the authorized amount of any additional class or series of shares of stock unless the same ranks junior to the Series C Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or create or authorize any obligation or security convertible into shares of Series C Preferred Stock or into shares of any other class or series of stock unless the same ranks junior to the Series C Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, whether any such creation, authorization or increase shall be by means of amendment to the Certificate of Incorporation or by merger, consolidation or otherwise; or

(3)     In any manner amend, alter or change the designations or the powers, preferences or rights, privileges or the restrictions of the Series C Preferred Stock materially or adversely, including the voting rights of such stock.

4C.  Special Votes of Series D Preferred Stock.  At any time when shares of Series D Preferred Stock are outstanding, except where the provisions of paragraph 4(c)(4G) apply or where the vote or written consent of the holders of a greater number of shares of the Series D Preferred Stock of the Corporation is required by law or by the Certificate of Incorporation, and in addition to any other vote required by law or the Certificate of Incorporation (except that if the provisions of paragraph 4(c)(4G) apply, the vote hereunder shall not be required), without the written consent of the holders of at least sixty six and two-thirds percent (66-2/3%) in interest of the then outstanding shares of Series D Preferred Stock given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a series, the Corporation will not:

(1)     Amend, alter or repeal any provision of its Certificate of Incorporation which (a) increases the authorized number of shares of Preferred Stock, or (b) increases (by more than 5% in the aggregate) the number of shares of authorized capital stock of the Corporation;

(2)     Create or authorize the creation of any additional class or series of shares of stock unless the same ranks junior to the Series D Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or increase the authorized amount of Series D Preferred Stock or increase the authorized amount of any additional class or series of shares of stock unless the same ranks junior to the Series D Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or create or authorize any obligation or security

-14-

convertible into shares of Series D Preferred Stock or into shares of any other class or series of stock unless the same ranks junior to the Series D Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, whether any such creation, authorization or increase shall be by means of amendment to the Certificate of Incorporation or by merger, consolidation or otherwise; or

(3)     In any manner amend, alter or change the designations or the powers, preferences or rights, privileges or the restrictions of the Series D Preferred Stock materially or adversely, including the voting rights of such stock.

4D.   Special Votes of Series E Preferred Stock.   At any time when shares of Series E Preferred Stock are outstanding, except where the provisions of paragraph 4(c)(4G) apply or where the vote or written consent of the holders of a greater number of shares of the Series E Preferred Stock of the Corporation is required by law or by the Certificate of Incorporation, and in addition to any other vote required by law or the Certificate of Incorporation (except that if the provisions of paragraph 4(c)(4G) apply, the vote hereunder shall not be required), without the written consent of the holders of at least a majority in interest of the then outstanding shares of Series E Preferred Stock given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a series, the Corporation will not:

(1)     Amend, alter or repeal any provision of its Certificate of Incorporation which (a) increases the authorized number of shares of Preferred Stock, or (b) increases (by more than 5% in the aggregate) the number of shares of authorized capital stock of the Corporation;

(2)     Create or authorize the creation of any additional class or series of shares of stock unless the same ranks junior to the Series E Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or increase the authorized amount of Series E Preferred Stock or increase the authorized amount of any additional class or series of shares of stock unless the same ranks junior to the Series E Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or create or authorize any obligation or security convertible into shares of Series E Preferred Stock or into shares of any other class or series of stock unless the same ranks junior to the Series E Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, whether any such creation, authorization or increase shall be by means of amendment to the Certificate of Incorporation or by merger, consolidation or otherwise; or

(3)     In any manner amend, alter or change the designations or the powers, preferences or rights, privileges or the restrictions of the Series E Preferred Stock materially or adversely, including the voting rights of such stock.

4E. Special Votes of Series F Preferred Stock. At any time when shares of Series F Preferred Stock are outstanding, except where the provisions of paragraph 4(c)(4G) apply or where the vote or written consent of the holders of a greater number of shares of the Series F Preferred Stock of the Corporation is required by law or by the Certificate of Incorporation, and in addition to any other vote required by law or the Certificate of Incorporation (except that if the provisions of paragraph 4(c)(4G) apply, the vote hereunder shall not be required), without the written consent of the holders of at least a majority in interest of the then outstanding shares of Series F Preferred Stock given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a series, the Corporation will not:

      (1)    Amend, alter or repeal any provision of its Certificate of Incorporation which (a) increases the authorized number of shares of Preferred Stock, or (b) increases (by more than 5% in the aggregate) the number of shares of authorized capital stock of the Corporation;

      (2)    Create or authorize the creation of any additional class or series of shares of stock unless the same ranks junior to the Series F Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or increase the authorized amount of Series F Preferred Stock or increase the authorized amount of any additional class or series of shares of stock unless the same ranks junior to the Series F Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or create or authorize any obligation or security convertible into shares of Series F Preferred Stock or into shares of any other class or series of stock unless the same ranks junior to the Series F Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, whether any such creation, authorization or increase shall be by means of amendment to the Certificate of Incorporation or by merger, consolidation or otherwise; or

      (3)    In any manner amend, alter or change the designations or the powers, preferences or rights, privileges or the restrictions of the Series F Preferred Stock materially or adversely, including the voting rights of such stock.

4F. Special Votes of Series G Preferred Stock. At any time when shares of Series G Preferred Stock are outstanding, except where the provisions of paragraph 4(c)(4G) apply or where the vote or written consent of the holders of a greater number of shares of the Series G Preferred Stock of the Corporation is required by law or by the Certificate of Incorporation, and in addition to any other vote required by law or the Certificate of Incorporation (except that if the provisions of paragraph 4(c)(4G) apply, the vote hereunder shall not be required), without the written consent of the holders of at least a majority in interest of the then outstanding shares of Series G Preferred Stock given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a series, the Corporation will not:

(1)     Amend, alter or repeal any provision of its Certificate of Incorporation which (a) increases the authorized number of shares of Preferred Stock, or (b) increases (by more than 5% in the aggregate) the number of shares of authorized capital stock of the Corporation;

(2)     Create or authorize the creation of any additional class or series of shares of stock unless the same ranks junior to the Series G Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or increase the authorized amount of Series G Preferred Stock or increase the authorized amount of any additional class or series of shares of stock unless the same ranks junior to the Series G Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, or create or authorize any obligation or security convertible into shares of Series G Preferred Stock or into shares of any other class or series of stock unless the same ranks junior to the Series G Preferred Stock as to dividends and the distribution of assets on the liquidation, dissolution or winding up of the Corporation, whether any such creation, authorization or increase shall be by means of amendment to the Certificate of Incorporation or by merger, consolidation or otherwise; or

(3)     In any manner amend, alter or change the designations or the powers, preferences or rights, privileges or the restrictions of the Series G Preferred Stock materially or adversely, including the voting rights of such stock.

### 4G.  Other Special Votes.

(1)     At any time when shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and/or Series G Preferred Stock are outstanding, except where the vote or written consent of the holders of a greater number of shares of the Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock or Series G Preferred Stock is required by law, without the written consent of the holders of at least a majority in interest of the then outstanding shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock given in writing or by a vote at a meeting, consenting or voting (as the case may be) together as one class, the Corporation shall not:

(a)     Merge or consolidate with or into, or permit any subsidiary to merge or consolidate with or into, any other corporation, corporations, entity or entities (except that any subsidiary may merge into the Corporation or with any other subsidiary); or

(b)     Sell, abandon, transfer, lease or otherwise dispose of more than fifty-five percent (55%) of its properties or assets.

-17-

(2)    At any time when shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock are outstanding, except where the vote or written consent of the holders of a greater number of shares of the Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock or Series G Preferred Stock is required by law or by the Certificate of Incorporation, without the written consent of the holders of at least a majority in interest of the then outstanding shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock given in writing or by a vote at a meeting, consenting or voting (as the case may be) together as one class, the Corporation shall not, other than as provided for herein, purchase, redeem or otherwise acquire (or pay into or set aside for a sinking fund for such purpose), any of the Preferred Stock or Common Stock, provided however, that this restriction shall not apply to (a) the repurchase of shares of Common Stock held by officers or employees of the Corporation which are subject to restrictive stock purchase agreements under which the Corporation has the option to repurchase such shares upon the occurrence of certain events, including the termination of employment, or (b) the repurchase of up to an aggregate of 391,986 shares of Common Stock held by Kim Myers, Nancy Heichemer and Richard T. Stack pursuant to Section 1.05 of the Series A Purchase Agreement (as hereinafter defined), or (c) the repurchase of up to an aggregate of 153,826 shares of Series B Preferred Stock held by Kim Myers, Nancy Heichemer and Richard T. Stack pursuant to Section 1.05 of the Series D Purchase Agreement (as hereinafter defined).

5.  Conversions.  The holders of shares of Preferred Stock shall have the following conversion rights:

5A.  Right to Convert.  Subject to the terms and conditions of this paragraph 4(c)(5), the holder of any share or shares of Preferred Stock shall have the right, at its option at any time, to convert any such shares of Preferred Stock (except that upon any liquidation of the Corporation the right of conversion shall terminate at the close of business on the business day immediately prior to the date fixed for payment of the amounts distributable on the Preferred Stock) into such number of fully paid and nonassessable shares of Common Stock as is obtained by, (a) in the case of the Series A Preferred Stock, (i) multiplying the number of shares of Series A Preferred Stock so to be converted by $7.65 and (ii) dividing the result by the conversion price of $7.65 per share or in case an adjustment of such price has taken place pursuant to the further provisions of this paragraph 4(c)(5), then by the conversion price as last adjusted and in effect at the date any share or shares of Preferred Stock are surrendered for conversion (such price, or such price as last adjusted, being referred to as the "Series A Conversion Price"), and (b) in the case of the Series B Preferred Stock, (i) multiplying the number of shares of Series B Preferred Stock so to be converted by $1.00 and (ii) dividing the result by the conversion price of $1.00 per share, or in case an adjustment of such price has taken place pursuant to the further provisions of this paragraph 4(c)(5), then by the conversion price as last adjusted and in effect at the date any share or shares of Series B Preferred Stock are surrendered for conversion (such price, or such price as last adjusted being referred to as the "Series B

-18-

Conversion Price"), and (c) in the case of the Series C Preferred Stock, (i) multiplying the number of shares of Series C Preferred Stock so to be converted by $14.50 and (ii) dividing the result by the conversion price of $12.00 per share or in case an adjustment of such price has taken place pursuant to the further provisions of this paragraph 4(c)(5), then by the conversion price as last adjusted and in effect at the date any share or shares of Series C Preferred Stock are surrendered for conversion (such price, or such price as last adjusted, being referred to as the "Series C Conversion Price"), and (d) in the case of the Series D Preferred Stock, (i) multiplying the number of shares of Series D Preferred Stock so to be converted by $22.00 and (ii) dividing the result by the conversion price of $12.00 per share or in case an adjustment of such price has taken place pursuant to the further provisions of this paragraph 4(c)(5), then by the conversion price as last adjusted and in effect at the date any share or shares of Series D Preferred Stock are surrendered for conversion (such price, or such price as last adjusted, being referred to as the "Series D Conversion Price"), and (e) in the case of the Series E Preferred Stock, except as provided in paragraph 4(c)(7D), (i) multiplying the number of shares of Series E Preferred Stock (excluding the Series E Warrant Shares) so to be converted by $10.00 and (ii) dividing the result by the conversion price of $10.00 per share or in case an adjustment of such price has taken place pursuant to the further provisions of this paragraph 4(c)(5), then by the conversion price as last adjusted and in effect at the date any share or shares of Series E Preferred Stock are surrendered for conversion (such price, or such price as last adjusted, being referred to as the "Series E Conversion Price"), and (f) in the case of the Series F Preferred Stock, (i) multiplying the number of shares of Series F Preferred Stock so to be converted by $10.00 and (ii) dividing the result by the conversion price of $10.00 per share or in case an adjustment of such price has taken place pursuant to the further provisions of this paragraph 4(c)(5), then by the conversion price as last adjusted and in effect at the date any share or shares of Series F Preferred Stock are surrendered for conversion (such price, or such price as last adjusted, being referred to as the "Series F Conversion Price"), and (g) in the case of the Series G Preferred Stock, (i) multiplying the number of shares of Series G Preferred Stock so to be converted by $10.00 and (ii) dividing the result by the conversion price of $10.00 per share or in case an adjustment of such price has taken place pursuant to the further provisions of this paragraph 4(c)(5), then by the conversion price as last adjusted and in effect at the date any share or shares of Series G Preferred Stock are surrendered for conversion (such price, or such price as last adjusted, being referred to as the "Series G Conversion Price"). Such rights of conversion shall be exercised by the holder thereof by giving written notice that the holder elects to convert a stated number of shares of Preferred Stock into Common Stock and by surrender of a certificate or certificates for the shares so to be converted to the Corporation at its principal office (or such other office or agency of the Corporation as the Corporation may designate by notice in writing to the holders of the Preferred Stock) at any time during its usual business hours on the date set forth in such notice, together with a statement of the name or names (with address) in which the certificate or certificates for shares of Common Stock shall be issued.

        5B. <u>Issuance of Certificates; Time Conversion Effected</u>. Promptly after the receipt of the written notice referred to in subparagraph 4(c)(5A) and surrender of the certificate or certificates for the share or shares of Preferred Stock to be converted, the

Corporation shall issue and deliver, or cause to be issued and delivered, to the holder, registered in such name or names as such holder may direct, a certificate or certificates for the number of whole shares of Common Stock issuable upon the conversion of such share or shares of Preferred Stock. To the extent permitted by law, such conversion shall be deemed to have been effected and the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price or Series G Conversion Price, as the case may be, shall be determined as of the close of business on the date on which such written notice shall have been received by the Corporation and the certificate or certificates for such share or shares shall have been surrendered as aforesaid, and at such time the rights of the holder of such share or shares of Preferred Stock shall cease, and the person or persons in whose name or names any certificate or certificates for shares of Common Stock shall be issuable upon such conversion shall be deemed to have become the holder or holders of record of the shares of Common Stock represented thereby.

5C.  Fractional Shares; Dividends; Partial Conversion.  No fractional shares shall be issued upon conversion of Preferred Stock into Common Stock and no payment or adjustment shall be made upon any conversion on account of any cash dividends previously declared and paid on the Common Stock issued upon such conversion. At the time of each conversion, the Corporation shall pay in cash an amount equal to all dividends (excluding Accruing Dividends and Special Accruing Dividends) accrued and unpaid on the shares of Preferred Stock surrendered for conversion to the date upon which such conversion is deemed to take place as provided in subparagraph 4(c)(5B). In case the number of shares of Preferred Stock represented by the certificate or certificates surrendered pursuant to subparagraph 4(c)(5A) exceeds the number of shares converted, the Corporation shall, upon such conversion, execute and deliver to the holder, at the expense of the Corporation, a new certificate or certificates for the number of shares of Preferred Stock represented by the certificate or certificates surrendered which are not to be converted. If any fractional share of Common Stock would, except for the provisions of the first sentence of this subparagraph 4(c)(5C), be delivered upon such conversion, the Corporation, in lieu of delivering such fractional share, shall pay to the holder surrendering the Preferred Stock for conversion an amount in cash equal to the current market price of such fractional share as determined in good faith by the Board of Directors of the Corporation.

5D.  Adjustment of Conversion Price Upon Issuance of Common Stock.  Except as provided in subparagraphs 4(c)(5E) and 4(c)(5F), if and whenever the Corporation shall, on or after February 12, 1996 (the "Filing Date"), issue or sell, or is, in accordance with subparagraphs 4(c)(5D)(l) through 4(c)(5D)(7), deemed to have been issued or sold, any shares of Common Stock for a consideration per share less than the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price in effect immediately prior to the time of such issue or sale, (such number being appropriately adjusted to reflect the occurrence of any event described in subparagraph 4(c)(5F)), then, forthwith upon such issue or sale, the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion

-20-

Price, as the case may be, shall be reduced to the price (but in no event below $.01 per share) at which the Corporation issued or sold, or is deemed to have issued or sold, such shares of Common Stock.

For purposes of this subparagraph 4(c)(5D), the following subparagraphs 4(c)(5D)(l) to 4(c)(5D)(9) shall also be applicable:

5D(l) <u>Issuance of Rights or Options</u>.  In case at any time after the Filing Date the Corporation shall in any manner grant (whether directly or by assumption in a merger or otherwise) any warrants or other rights to subscribe for or to purchase, or any options for the purchase of, Common Stock or any stock or security convertible into or exchangeable for Common Stock (such warrants, rights or options being called "Options" and such convertible or exchangeable stock or securities being called "Convertible Securities") whether or not such Options or the right to convert or exchange any such Convertible Securities are immediately exercisable, and the price per share (the "Exercise Price") for which Common Stock is issuable upon the exercise of such Options or upon the conversion or exchange of such Convertible Securities (determined by dividing (i) the total amount, if any, received or receivable by the Corporation as consideration for the granting of such Options, plus the minimum aggregate amount of additional consideration payable to the Corporation upon the exercise of all such Options, plus, in the case of such Options which relate to Convertible Securities, the minimum aggregate amount of additional consideration, if any, payable upon the issue or sale of such Convertible Securities and upon the conversion or exchange thereof, by (ii) the total maximum number of shares of Common Stock issuable upon the exercise of such Options or upon the conversion or exchange of all such Convertible Securities issuable upon the exercise of such Options) shall be less than the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price in effect immediately prior to the time of the granting of such Options, then the total maximum number of shares of Common Stock issuable upon the exercise of such Options or upon conversion or exchange of the total maximum amount of such Convertible Securities issuable upon the exercise of such Options shall be deemed to have been issued for the Exercise Price per share as of the date of granting of such Options or the issuance of such Convertible Securities and thereafter shall be deemed to be outstanding.  Except as otherwise provided in subparagraph 4(c)(5D)(3), no adjustment of the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price shall be made upon the actual issue of such Common Stock or of such Convertible Securities upon exercise of such Options or upon the actual issue of such Common Stock upon conversion or exchange of such Convertible Securities.

5D(2) <u>Issuance of Convertible Securities</u>.  In case the Corporation shall after the Filing Date in any manner issue (whether directly or by assumption in a merger or otherwise) or sell any Convertible Securities, whether or not the rights to exchange or convert any such Convertible Securities are immediately exercisable, and the price per share (the "Exchange Price") for which Common Stock is issuable upon such conversion or exchange

-21-

(determined by dividing (i) the total amount received or receivable by the Corporation as consideration for the issue or sale of such Convertible Securities, plus the minimum aggregate amount of additional consideration, if any, payable to the Corporation upon the conversion or exchange thereof, by (ii) the total maximum number of shares of Common Stock issuable upon the conversion or exchange of all such Convertible Securities) shall be less than the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price in effect immediately prior to the time of such issue or sale, then the total maximum number of shares of Common Stock issuable upon conversion or exchange of all such Convertible Securities shall be deemed to have been issued for the Exchange Price per share as of the date of the issue or sale of such Convertible Securities and thereafter shall be deemed to be outstanding, provided that (a) except as otherwise provided in subparagraph 4(c)(5D)(3), no adjustment of the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price shall be made upon the actual issue of such Common Stock upon conversion or exchange of such Convertible Securities and (b) if any such issue or sale of such Convertible Securities is made upon exercise of any Options to purchase any such Convertible Securities for which adjustments of the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price have been or are to be made pursuant to other provisions of this subparagraph 4(c)(5D), no further adjustment of the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price shall be made by reason of such issue or sale.

5D(3) <u>Change in Option Price or Conversion Rate</u>. Upon the happening of any of the following events, namely, if the purchase price provided for in any Option referred to in subparagraph 4(c)(5D)(l), the additional consideration, if any, payable upon the conversion or exchange of any Convertible Securities referred to in subparagraph 4(c)(5D)(l) or 4(c)(5D)(2), or the rate at which Convertible Securities referred to in subparagraph 4(c)(5D)(l) or 4(c)(5D)(2) are convertible into or exchangeable for Common Stock shall change at any time (including, but not limited to, changes under or by reason of provisions designed to protect against dilution), the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price in effect at the time of such event shall forthwith be readjusted to the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price which would have been in effect at such time had such Options or Convertible Securities still outstanding provided for such changed purchase price, additional consideration or conversion rate, as the case may be, at the time initially granted, issued or sold, but only if as a result of such adjustment the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price then in effect hereunder is thereby reduced; and on the expiration of any such Option or the termination of any such right to convert or exchange such Convertible Securities, the Series A Conversion

Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price and the Series G Conversion Price then in effect hereunder shall forthwith be increased to the Conversion Price which would have been in effect at the time of such expiration or termination had such Option or Convertible Securities, to the extent outstanding immediately prior to such expiration or termination, never been issued.

5D(4) Stock Dividends. In case the Corporation shall declare a dividend or make any other distribution upon any stock of the Corporation payable in Common Stock (except for the issue of stock dividends or distributions upon the outstanding Common Stock for which adjustment is made pursuant to paragraph 4(c)(5F)), Options or Convertible Securities, any Common Stock, Options or Convertible Securities, as the case may be, issuable in payment of such dividend or distribution shall be deemed to have been issued or sold without consideration.

5D(5) Consideration for Stock. In case any shares of Common Stock, Options or Convertible Securities shall be issued or sold for cash, the consideration received therefor shall be deemed to be the amount received by the Corporation therefor, without deduction therefrom of any expenses incurred or any underwriting commissions or concessions paid or allowed by the Corporation in connection therewith. In case any shares of Common Stock, Options or Convertible Securities shall be issued or sold for a consideration other than cash, the amount of the consideration other than cash received by the Corporation shall be deemed to be the fair value of such consideration as determined in good faith by the Board of Directors of the Corporation, without deduction of any expenses incurred or any underwriting commissions or concessions paid or allowed by the Corporation in connection therewith. In case any Options shall be issued in connection with the issue and sale of other securities of the Corporation, together comprising one integral transaction in which no specific consideration is allocated to such Options by the parties thereto, such Options shall be deemed to have been issued for such consideration as determined in good faith by the Board of Directors of the Corporation.

5D(6) Record Date. In case the Corporation shall take a record of the holders of its Common Stock for the purpose of entitling them (i) to receive a dividend or other distribution payable in Common Stock, Options or Convertible Securities or (ii) to subscribe for or purchase Common Stock, Options or Convertible Securities, then such record date shall be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

5D(7) Treasury Shares. The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Corporation, and the disposition of any such shares shall be considered an issue or sale of Common Stock for the purpose of this subparagraph 4(c)(5D).

5D(8) Bank Default. In the event that the Corporation shall fail to pay any Indebtedness (as defined in the Series E, F and G Purchase Agreement) for borrowed money owing by the Corporation, or any interest or premium thereon, when due (or, if permitted by the terms of the relevant document, within any applicable grace period), whether such Indebtedness shall become due by scheduled maturity, by required prepayment, by acceleration, by demand or otherwise, or shall fail to perform any term, covenant or agreement on its part to be performed under any agreement or instrument evidencing or securing or relating to any Indebtedness owing by the Corporation, when required to be performed, (or, if permitted by the terms of the relevant document, within any applicable grace period), if the effect of such failure to pay or perform is to accelerate the maturity of such Indebtedness, unless such failure to pay or perform shall be waived by the holder or holders of such Indebtedness or such trustee or trustees, thereupon, (a) the Series A Conversion Price shall be automatically lowered to $5.69, or such other number calculated so that upon conversion of 522,648 shares of Series A Preferred Stock (the "Initial Series A Shares") into shares of Common Stock, such shares would represent thirteen percent (13%) of the capital stock of the Corporation on a fully-diluted and as-if-converted basis (including the Reserved Employee Shares), and (b) the Series E Conversion Price (except in the case of the Series E Warrant Shares), the Series F Conversion Price and the Series G Conversion Price shall be automatically lowered to $8.00.

5E. Certain Issues of Common Stock and Series E Preferred Stock Excepted. Anything herein to the contrary notwithstanding, the Corporation shall not be required to make any adjustment of the Series A Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price or the Series F Conversion Price in the case of the issuance of (i) shares of Common Stock issuable upon conversion of the Preferred Stock, (ii) Reserved Employee Shares (as defined in paragraph 4(c)(9)(1) hereof), (iii) shares of Series C Preferred Stock or Common Stock issuable upon exercise of the DLJ Warrants, (iv) up to 907,260 shares of Series E Preferred Stock, up to 1,509,400 shares of Series F Preferred Stock and up to 1,100,000 shares of Series G Preferred Stock authorized by this Certificate of Amendment, and (v) the Series E Warrants or shares of Series E Preferred Stock or Common Stock issuable upon exercise of the Series E Warrants.

5F. Subdivision or Combination of Common Stock. In case the Corporation shall at any time subdivide (by any stock split, stock dividend or otherwise) its outstanding shares of Common Stock into a greater number of shares, the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, the Series F Conversion Price and the Series G Conversion Price in effect immediately prior to such subdivision shall be proportionately reduced, and, conversely, in case the outstanding shares of Common Stock shall be combined into a smaller number of shares, the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, the Series F Conversion Price and the Series G Conversion Price in effect immediately prior to such combination shall be proportionately increased.

5G.  Reorganization or Reclassification.  If any capital reorganization or reclassification of the capital stock of the Corporation shall be effected in such a way that holders of Common Stock shall be entitled to receive stock, securities or assets with respect to or in exchange for Common Stock, then, as a condition of such reorganization or reclassification, lawful and adequate provisions shall be made whereby each holder of a share or shares of Preferred Stock shall thereupon have the right to receive, upon the basis and upon the terms and conditions specified herein and in lieu of the shares of Common Stock immediately theretofore receivable upon the conversion of such share or shares of Preferred Stock, such shares of stock, securities or assets as may be issued or payable with respect to or in exchange for a number of outstanding shares of such Common Stock equal to the number of shares of such Common Stock immediately theretofore receivable upon such conversion had such reorganization or reclassification not taken place, and in any such case appropriate provisions shall be made with respect to the rights and interests of such holder to the end that the provisions hereof (including without limitation provisions for adjustments of the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price) shall thereafter be applicable, as nearly as may be, in relation to any shares of stock, securities or assets thereafter deliverable upon the exercise of such conversion rights.

5H.  Notice of Adjustment.  Upon any adjustment of the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, the Series F Conversion Price and/or Series G Conversion Price, then and in each such case the Corporation shall give written notice thereof, by first class mail, postage prepaid, or by telex or facsimile transmission to non-U.S. residents, addressed to each holder of shares of Preferred Stock at the address of such holder as shown on the books of the Corporation, which notice shall state the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price and/or Series G Conversion Price resulting from such adjustment, setting forth in reasonable detail the method upon which such calculation is based.

5I.  Other Notices.  In case at any time:

(1) the Corporation shall declare any dividend upon its Common Stock payable in cash or stock or make any other distribution to the holders of its Common Stock;

(2) the Corporation shall offer for subscription pro rata to the holders of its Common Stock any additional shares of stock of any class or other rights;

(3) there shall be any capital reorganization or reclassification of the capital stock of the Corporation, or a consolidation or merger of the Corporation with or into, or a sale of all or substantially all its assets to, another entity or entities; or

-25-

(4) there shall be a voluntary or involuntary dissolution, liquidation or winding up of the Corporation;

then, in any one or more of said cases, the Corporation shall give, by first class mail, postage prepaid, or by telex or facsimile transmission to non-U.S. residents, addressed to each holder of any shares of Preferred Stock at the address of such holder as shown on the books of the Corporation, (a) at least 20 days' prior written notice of the date on which the books of the Corporation shall close or a record shall be taken for such dividend, distribution or subscription rights or for determining rights to vote in respect of any such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation or winding up and (b) in the case of any such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation or winding up, at least 20 days' prior written notice of the date when the same shall take place. Such notice in accordance with the foregoing clause (a) shall also specify, in the case of any such dividend, distribution or subscription rights, the date on which the holders of Common Stock shall be entitled thereto and such notice in accordance with the foregoing clause (b) shall also specify the date on which the holders of Common Stock shall be entitled to exchange their Common Stock for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation or winding up, as the case may be.

5J.  Stock to be Reserved.  The Corporation will at all times reserve and keep available out of its authorized Common Stock, solely for the purpose of issuance upon the conversion of Preferred Stock as herein provided, such number of shares of Common Stock as shall then be issuable upon the conversion of all outstanding shares of Preferred Stock.  The Corporation covenants that all shares of Common Stock which shall be so issued shall be duly and validly issued and fully paid and nonassessable and free from all taxes, liens and charges with respect to the issue thereof, and, without limiting the generality of the foregoing, the Corporation, together with the holders of the Preferred Stock, covenant that they will from time to time take all such action as may be requisite to assure that the par value per share of the Common Stock is at all times equal to or less than the Series A Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price and/or the Series G Conversion Price in effect at the time.  The Corporation will take all such action as may be necessary to assure that all such shares of Common Stock may be so issued without violation of any applicable law or regulation, or of any requirement of any national securities exchange upon which the Common Stock may be listed.

5K.  No Reissuance of Preferred Stock.  Shares of Preferred Stock which are converted into shares of Common Stock as provided herein shall not be reissued.

5L.  Issue Tax.  The issuance of certificates for shares of Common Stock upon conversion of Preferred Stock shall be made without charge to the holders thereof for any issuance tax in respect thereof, provided that the Corporation shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than that of the holder of the Preferred Stock which is being converted.

-26-

5M. Closing of Books. The Corporation will at no time close its transfer books against the transfer of any Preferred Stock or of any shares of Common Stock issued or issuable upon the conversion of any shares of Preferred Stock in any manner which interferes with the timely conversion of such Preferred Stock, except as may otherwise be required to comply with applicable securities laws.

5N. Definition of Common Stock. As used in this paragraph 4(c)(5), the term "Common Stock" shall mean and include the Corporation's authorized Common Stock, par value $.01 per share, as constituted on the date of filing of these terms of the Preferred Stock, and shall also include any capital stock of any class of the Corporation thereafter authorized which shall neither be limited to a fixed sum or percentage of par value in respect of the rights of the holders thereof to participate in dividends nor entitled to a preference in the distribution of assets upon the voluntary or involuntary liquidation, dissolution or winding up of the Corporation; provided that the shares of Common Stock receivable upon conversion of shares of Preferred Stock shall include only shares designated as Common Stock of the Corporation on the date of filing of this instrument, or in case of any reorganization or reclassification of the outstanding shares thereof, the stock, securities or assets provided for in subparagraph 4(c)(5G).

5O. Mandatory Conversion. All outstanding shares of Preferred Stock shall automatically convert to shares of Common Stock upon the earlier to occur of: (A) such time as sixty-five percent (65%) in interest of the then outstanding shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock, voting as one class, consent in writing thereto, or (B) if at any time the Corporation shall effect a firm commitment underwritten public offering of shares of Common Stock in which (i) (x) the aggregate net proceeds from such offering paid to the Corporation shall be at least $20,000,000 and (y) the price paid by the public for such shares shall be at least $14.40 per share (appropriately adjusted to reflect the occurrence after the Filing Date of any event described in subparagraph 4(c)(5F)) or (ii) the aggregate net proceeds from such offering and/or the price paid by the public for such shares are lower than the amounts set forth in subparagraph 4(c)(5O)(B)(i), if the written consent of sixty percent (60%) in interest of the then outstanding shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock, voting as one class, has been obtained, then effective upon the closing of the sale of such shares by the Corporation pursuant to such public offering, all outstanding shares of Preferred Stock shall automatically convert to shares of Common Stock.

6. Redemption. The shares of Preferred Stock shall be redeemed as follows:

6A. Mandatory Redemption of Series E Preferred Stock. Subject to the limitations of applicable law: (i) on February 1, 2000 (the "First Redemption Date"), the Corporation shall redeem from each holder of shares of Series E Preferred Stock, one-third of the shares of Series E Preferred Stock held by such holder on the First Redemption Date; (ii) on

February 1, 2001 (the "Second Redemption Date"), the Corporation shall redeem from each holder of shares of Series E Preferred Stock, one-half of the shares of Preferred Stock held by such holder on the Second Redemption Date; and (iii) on February 1, 2002 (the "Third Redemption Date"), the Corporation shall redeem from each holder of shares of Series E Preferred Stock, all remaining shares of Preferred Stock held by such holder on the Third Redemption Date. The First Redemption Date, the Second Redemption Date and the Third Redemption Date are collectively referred to as the "Redemption Dates". The redemption of all or any portion of the shares of Series E Preferred Stock to be redeemed by the Corporation pursuant to this paragraph 4(c)(6A) may be waived, and deferred for successive periods of one year with respect to each redemption offer, in whole or in part (such partial waiver to apply on a pro rata basis to all holders of shares of Series E Preferred Stock) by the consent of the holders of not less than a majority in interest of the then outstanding shares of Series E Preferred Stock. Such waiver shall be in writing and delivered to the Corporation before the date of such redemption.

6B.  <u>Series E Redemption Price and Payment</u>.  Subject to the provisions of paragraph 4(c)(6M) below, the Series E Preferred Stock to be redeemed on the Redemption Dates shall be redeemed by paying for each share in cash, except as provided in paragraph 4(c)(7D), an amount equal to $10.00 per share plus an amount equal to all dividends (including Accruing Dividends and Special Accruing Dividends) declared and unpaid thereon or otherwise deemed due thereon, such amount being referred to as the "Series E Redemption Price." Such payment shall be made in full on each of the Redemption Dates to the holders entitled thereto.

6C.  <u>Mandatory Redemption of Series F Preferred Stock</u>.  Subject to the limitations of applicable law: (i) on the First Redemption Date, the Corporation shall redeem from each holder of shares of Series F Preferred Stock, one-third of the shares of Series F Preferred Stock held by such holder on the First Redemption Date; (ii) on the Second Redemption Date, the Corporation shall redeem from each holder of shares of Series F Preferred Stock, one-half of the shares of Preferred Stock held by such holder on the Second Redemption Date; and (iii) on the Third Redemption Date, the Corporation shall redeem from each holder of shares of Series F Preferred Stock, all remaining shares of Preferred Stock held by such holder on the Third Redemption Date. The redemption of all or any portion of the shares of Series F Preferred Stock to be redeemed by the Corporation pursuant to this paragraph 4(c)(6C) may be waived, and deferred for successive periods of one year with respect to each redemption offer, in whole or in part (such partial waiver to apply on a pro rata basis to all holders of shares of Series F Preferred Stock) by the consent of the holders of not less than a majority in interest of the then outstanding shares of Series F Preferred Stock. Such waiver shall be in writing and delivered to the Corporation before the date of such redemption.

6D.  <u>Series F Redemption Price and Payment</u>.  Subject to the provisions of paragraph 4(c)(6M) below, the Series F Preferred Stock to be redeemed on the Redemption Dates shall be redeemed by paying for each share in cash an amount equal to $10.00

per share plus an amount equal to all dividends (including Accruing Dividends and Special Accruing Dividends) declared and unpaid thereon or otherwise deemed due thereon, such amount being referred to as the "Series F Redemption Price." Such payment shall be made in full on each of the Redemption Dates to the holders entitled thereto.

      6E. <u>Mandatory Redemption of Series G Preferred Stock</u>. Subject to the limitations of applicable law: (i) on February 1, 2000 (the "First Redemption Date"), the Corporation shall redeem from each holder of shares of Series G Preferred Stock, one-third of the shares of Series G Preferred Stock held by such holder on the First Redemption Date; (ii) on February 1, 2001 (the "Second Redemption Date"), the Corporation shall redeem from each holder of shares of Series G Preferred Stock, one-half of the shares of Preferred Stock held by such holder on the Second Redemption Date; and (iii) on February 1, 2002 (the "Third Redemption Date"), the Corporation shall redeem from each holder of shares of Series G Preferred Stock, all remaining shares of Preferred Stock held by such holder on the Third Redemption Date. The First Redemption Date, the Second Redemption Date and the Third Redemption Date are collectively referred to as the "Redemption Dates". The redemption of all or any portion of the shares of Series G Preferred Stock to be redeemed by the Corporation pursuant to this paragraph 4(c)(6E) may be waived, and deferred for successive periods of one year with respect to each redemption offer, in whole or in part (such partial waiver to apply on a pro rata basis to all holders of shares of Series G Preferred Stock) by the consent of the holders of not less than a majority in interest of the then outstanding shares of Series G Preferred Stock. Such waiver shall be in writing and delivered to the Corporation before the date of such redemption.

      6F. <u>Series G Redemption Price and Payment</u>. Subject to the provisions of paragraph 4(c)(6M) below, the Series G Preferred Stock to be redeemed on the Redemption Dates shall be redeemed by paying for each share in cash an amount equal to $10.00 per share plus an amount equal to all dividends (including Accruing Dividends and Special Accruing Dividends) declared and unpaid thereon or otherwise deemed due thereon, such amount being referred to as the "Series G Redemption Price." Such payment shall be made in full on each of the Redemption Dates to the holders entitled thereto.

      6G. <u>Mandatory Redemption of Series D Preferred Stock</u>. Subject to the limitations of applicable law: (i) on the First Redemption Date, the Corporation shall redeem from each holder of shares of Series D Preferred Stock, one-third of the shares of Series D Preferred Stock held by such holder on the First Redemption Date; (ii) on the Second Redemption Date, the Corporation shall redeem from each holder of shares of Series D Preferred Stock, one-half of the shares of Preferred Stock held by such holder on the Second Redemption Date; and (iii) on the Third Redemption Date, the Corporation shall redeem from each holder of shares of Series D Preferred Stock, all remaining shares of Preferred Stock held by such holder on the Third Redemption Date. The redemption of all or any portion of the shares of Series D Preferred Stock to be redeemed by the Corporation pursuant to this paragraph 4(c)(6G) may be waived, and deferred for successive periods of one year with respect to each redemption offer, in

whole or in part (such partial waiver to apply on a pro rata basis to all holders of shares of Series D Preferred Stock) by the consent of the holders of not less than fifty five percent (55%) in interest of the then outstanding shares of Series D Preferred Stock. Such waiver shall be in writing and delivered to the Corporation before the date of such redemption.

6H. <u>Series D Redemption Price and Payment</u>. Subject to the provisions of paragraph 4(c)(6M) below, the Series D Preferred Stock to be redeemed on the Redemption Dates shall be redeemed by paying for each share in cash an amount equal to $22.00 per share plus an amount equal to all dividends (including Accruing Dividends and Special Accruing Dividends) declared and unpaid thereon or otherwise deemed due thereon, such amount being referred to as the "Series D Redemption Price." Such payment shall be made in full on each of the Redemption Dates to the holders entitled thereto.

6I. <u>Optional Redemption of Series C Preferred Stock</u>. Subject to the limitations of applicable law, and so long as the holders of the Series D Preferred Stock, the holders of the Series E Preferred Stock, the holders of the Series F Preferred Stock, and/or the holders of the Series G Preferred Stock do not waive their rights to mandatory redemption pursuant to paragraph 4(c)(6A), 4(c)(6C), 4(c)(6E) or 4(c)(6G), then upon the written request of the holders of the fifty five percent (55%) in interest of the Series C Preferred Stock, provided at least ten (10) days prior to any Redemption Date, (i) on the First Redemption Date, the Corporation shall redeem from each holder of shares of Series C Preferred Stock, one-third of the shares of Series C Preferred Stock, held by such holder on the First Redemption Date; (ii) on the Second Redemption Date, the Corporation shall redeem from each holder of shares of Series C Preferred Stock, one-half of the shares of Preferred Stock held by such holder on the Second Redemption Date; and (iii) on the Third Redemption Date, the Corporation shall redeem from each holder of shares of Series C Preferred Stock, all remaining shares of Preferred Stock held by such holder on the Third Redemption Date. The redemption of all or any portion of the shares of Series C Preferred Stock to be redeemed by the Corporation pursuant to this paragraph 4(c)(6I) shall be waived if redemption of the Series D Preferred Stock, the Series E Preferred Stock, the Series F Preferred Stock and/or the Series G Preferred Stock is waived by the holders of the Series D Preferred Stock, the Series E Preferred Stock, the Series F Preferred Stock and/or the Series G Preferred Stock, and deferred for successive periods of one year with respect to each redemption offer, in whole or in part (such partial waiver to apply on a pro rata basis to all holders of shares of Series C Preferred Stock).

6J. <u>Series C Redemption Price and Payment</u>. Subject to the provisions of paragraph 4(c)(6M) below, the Series C Preferred Stock to be redeemed on the Redemption Dates shall be redeemed by paying for each share in cash an amount equal to $14.50 per share plus an amount equal to all dividends (including Accruing Dividends and Special Accruing Dividends) declared and unpaid thereon or otherwise deemed due thereon, such amount being referred to as the "Series C Redemption Price." Such payment shall be made in full on each of the Redemption Dates to the holders entitled thereto.

6K. <u>Optional Redemption of Series A Preferred Stock</u>. Subject to the limitations of applicable law, and so long as the holders of the Series D Preferred Stock, the holders of the Series E Preferred Stock, the holders of the Series F Preferred Stock and/or the holders of the Series G Preferred Stock do not waive their rights to mandatory redemption pursuant to paragraph 4(c)(6A), 4(c)(6C), 4(c)(6E) or 4(c)(6G), then upon the written request of the holders of sixty six and two-thirds percent (66-2/3%) in interest of the Series A Preferred Stock, provided at least ten (10) days prior to any Redemption Date, (i) on the First Redemption Date, the Corporation shall redeem from each holder of shares of Series A Preferred Stock, one-third of the shares of Series A Preferred Stock, held by such holder on the First Redemption Date; (ii) on the Second Redemption Date, the Corporation shall redeem from each holder of shares of Series A Preferred Stock, one-half of the shares of Preferred Stock held by such holder on the Second Redemption Date; and (iii) on the Third Redemption Date, the Corporation shall redeem from each holder of shares of Series A Preferred Stock, all remaining shares of Preferred Stock held by such holder on the Third Redemption Date. The redemption of all or any portion of the shares of Series A Preferred Stock to be redeemed by the Corporation pursuant to this paragraph 4(c)(6K) shall be waived if redemption of the Series D Preferred Stock, the Series E Preferred Stock, the Series F Preferred Stock and/or the Series G Preferred Stock is waived by the holders of the Series D Preferred Stock, the Series E Preferred Stock, the Series F Preferred Stock and/or the Series G Preferred Stock, and deferred for successive periods of one year with respect to each redemption offer, in whole or in part (such partial waiver to apply on a pro rata basis to all holders of shares of Series A Preferred Stock).

6L. <u>Series A Redemption Price and Payment</u>. Subject to the provisions of paragraph 4(c)(6M) below, the Series A Preferred Stock to be redeemed on the Redemption Dates shall be redeemed by paying for each share in cash an amount equal to $7.65 per share plus an amount equal to all dividends (including Accruing Dividends and Special Accruing Dividends) declared and unpaid thereon or otherwise deemed due thereon, such amount being referred to as the "Series A Redemption Price." Such payment shall be made in full on each of the Redemption Dates to the holders entitled thereto.

6M. <u>Increase of Redemption Price</u>. At any time or from time to time from and after October 1, 1997, but prior to the First Redemption Date, the holders of (i) sixty six and two-thirds percent (66 ⅔%) in interest of the Series A Preferred Stock, or (ii) fifty five percent (55%) in interest of the Series C Preferred Stock, or (iii) sixty six and two-thirds percent (66-2/3%) in interest of the Series D Preferred Stock, or (iv) a majority in interest of the Series E Preferred Stock, or (v) a majority in interest of the Series F Preferred Stock, or (vi) a majority in interest of the Series G Preferred Stock, may present to the Board of Directors of the Corporation an Investment Banker's Letter. Such Investment Banker's Letter shall indicate that it is such firm's reasonable belief that, in light of prevailing market conditions, the Corporation's historical financial results and current business prospects, it would then be reasonably possible to effect an underwritten public offering of the Corporation's Common Stock at a per share price to the public of at least $14.40. In the event that the Investment Banker's Letter is presented to the Corporation, and the Corporation has not completed a Public Offering

prior to the First Redemption Date, then the Series A Redemption Price shall be increased to the Series A Target Return Price, the Series C Redemption Price shall be increased to the Series C Target Return Price, the Series D Redemption Price shall be increased to the Series D Target Return Price, the Series E Redemption Price shall be increased to the Series E Target Return Price, the Series F Redemption Price shall be increased to the Series F Target Return Price and the Series G Redemption Price shall be increased to the Series G Target Return Price. Notwithstanding the foregoing, in no event shall the aggregate (a) Series A Redemption Price for all shares of Series A Preferred Stock redeemed pursuant to this paragraph 4(c)(6M) exceeds $19,660,000, it being understood that if such limitation becomes applicable, the Redemption Price payable to each holder of Series A Preferred Stock shall be reduced ratably based upon the relative number of shares owned by each of them, or (b) Series C Redemption Price for all shares of Series C Preferred Stock redeemed pursuant to this paragraph 4(c)(6M) exceeds $27,285,000, it being understood that if such limitation becomes applicable, the Redemption Price payable to each holder of Series C Preferred Stock shall be reduced ratably based upon the relative number of shares owned by each of them, or (c) Series D Redemption Price for all shares of Series D Preferred Stock redeemed pursuant to this paragraph 4(c)(6M) exceeds $56,911,745, it being understood that if such limitation becomes applicable, the Redemption Price payable to each holder of Series D Preferred Stock shall be reduced ratably based upon the relative number of shares owned by each of them, or (d) Series E Redemption Price for all shares of Series E Preferred Stock, (excluding the Series E Warrant Shares) redeemed pursuant to this paragraph 4(c)(6M) exceeds $15,060,516, it being understood that if such limitation becomes applicable, the Redemption Price payable to each holder of Series E Preferred Stock shall be reduced ratably based upon the relative number of shares owned by each of them, or (e) Series F Redemption Price for all shares of Series F Preferred Stock redeemed pursuant to this paragraph 4(c)(6M) exceeds $25,056,040, it being understood that if such limitation becomes applicable, the Redemption Price payable to each holder of Series F Preferred Stock shall be reduced ratably based upon the relative number of shares owned by each of them, or (f) Series G Redemption Price for all shares of Series G Preferred Stock redeemed pursuant to this paragraph 4(c)(6M) exceeds $18,233,539, it being understood that if such limitation becomes applicable, the Redemption Price payable to each holder of Series G Preferred Stock shall be reduced ratably based upon the relative number of shares owned by each of them.

6N. Redemption Mechanics. At least 20 but not more than 30 days prior to each Redemption Date, written notice (the "Redemption Notice") shall be given by the Corporation by mail, postage prepaid, or by telex or facsimile transmission to non-U.S. residents, to each holder of record (at the close of business on the business day next preceding the day on which the Redemption Notice is given) of shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock notifying such holder of the redemption and specifying the Series A Redemption Price, the Series C Redemption Price, the Series D Redemption Price, the Series E Redemption Price, the Series F Redemption Price, the Series G Redemption Price, the Redemption Date and the place where said Series A Redemption Price, Series C Redemption Price, Series D Redemption Price, Series E Redemption Price, Series F Redemption Price and

-32-

Series G Redemption Price shall be payable. The Redemption Notice shall be addressed to each holder at his address as shown by the records of the Corporation. From and after the close of business on the Redemption Date, unless there shall have been a default in the payment of the Series A Redemption Price, Series C Redemption Price, Series D Redemption Price, Series E Redemption Price, Series F Redemption Price or Series G Redemption Price, all rights of holders of shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock, if redemption of the Series A Preferred Stock, and/or Series C Preferred Stock is requested (except the right to receive the Series A Redemption Price, the Series C Redemption Price, the Series D Redemption Price, the Series E Redemption Price, the Series F Redemption Price or the Series G Redemption Price, as the case may be), shall cease with respect to such shares, and such shares shall not thereafter be transferred on the books of the Corporation or be deemed to be outstanding for any purpose whatsoever. If the funds of the Corporation legally available for redemption of shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock, if redemption of the Series A Preferred Stock and/or Series C Preferred Stock is requested, on any Redemption Date are insufficient to redeem the total number of outstanding shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock to be redeemed on such Redemption Date, (1) the holders of shares of Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock, first shall be paid ratably, any funds legally available for redemption of such shares according to the respective amounts which would be payable with respect to the full number of shares of Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock owned by them and to be redeemed at such time if all such shares of Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock to be redeemed at such time by the Corporation were redeemed in full, and upon payment in full of all amounts payable on such Redemption Date to the holders of the Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock, (2) the holders of shares of Series A Preferred Stock, Series C Preferred Stock and Series D Preferred Stock shall share ratably in any funds remaining legally available for redemption of such shares according to the respective amounts which would be payable with respect to the full number of shares owned by them and to be redeemed at such time if all such shares to be redeemed at such time by the Corporation were redeemed in full. The shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock not redeemed shall remain outstanding and entitled to all rights and preferences provided herein. At any time thereafter when additional funds of the Corporation are legally available for the redemption of such shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock, such funds will be used, at the end of the next succeeding fiscal quarter, to redeem the balance of such shares, or such portion thereof for which funds are then legally available, on the basis set forth above.

6O. <u>Redeemed or Otherwise Acquired Shares to be Retired.</u> Any shares of Series A Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E

Preferred Stock, Series F Preferred Stock and Series G Preferred Stock redeemed pursuant to this paragraph 4(c)(6) or any shares of capital stock otherwise acquired by the Corporation in any manner whatsoever shall be canceled and shall not under any circumstances be reissued; and the Corporation may from time to time take such appropriate corporate action as may be necessary to reduce accordingly the number of authorized shares of the affected class or series of capital stock.

7.    Series E Warrants.

7A.  Class A Warrants.  The holders of shares of Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock shall receive, on the date of the Second Closing (as defined in the Series E, F and G Purchase Agreement), warrants (the "Class A Warrants") to purchase shares of Series E Preferred Stock, or Common Stock if all shares of Series E Preferred Stock have been converted to Common Stock, to purchase an aggregate of three percent (3%) of the Corporation on a Fully-Diluted Basis (as hereinafter defined).  The Class A Warrants shall become exercisable in the event that, for the fiscal year ended February, 1997 ("FY 1997"), (1) the Store Contribution (as hereinafter defined) is less than or equal to four and one quarter percent (4.25%) (the "1997 Store Contribution Percentage") of the Corporation's sales (excluding proceeds from real estate sale-lease back transactions), or (2) Administration Expense (as hereinafter defined) exceeds fourteen million five hundred thousand dollars ($14,500,000).  For purposes of this paragraph 4(c)(7), "Store Contribution" shall mean the Corporation's sales (excluding proceeds from real estate sale-lease back transactions) less cost of sales, store payrolls, bonuses, employee fringe benefits, taxes, employee health insurance premiums and other expenses, advertising and store general and administrative expenses, provided, that cash reserves for store closings of up to one million dollars ($1,000,000) over any two-year period may be excluded from the calculation of Store Contribution if such reserves are approved by the vote of at least eighty percent (80%) of the Corporation's Board of Directors. For purposes of this paragraph 4(c)(7), "Administration Expense" shall mean the Corporation's corporate expense before pre-operating costs, provided, that if Store Contribution exceeds the 1997 Store Contribution Percentage, the excess of such amount shall be used to reduce Administration Expense for FY 1997, and if Store Contribution exceeds the 1998 Store Contribution Percentage (as hereinafter defined), the excess of such amount shall be used to reduce Administration Expense for FY 1998 (as hereinafter defined).  For purposes of the Class A Warrants, Store Contribution and Administration Expense shall be calculated using the information reflected in the Corporation's audited financial statements for FY 1997 ("FY 1997 Audited Statements).  For purposes of this paragraph 4(c)(7), a "Fully-Diluted Basis" shall assume the exercise of all Options that have been granted by the Corporation and the conversion of all Convertible Securities then outstanding, whether or not such Options or the right to convert or exchange any such Convertible Securities are immediately exercisable, including the shares issuable upon the exercise of the Series E Warrants (as hereinafter defined) for which the calculation is being made but excluding the shares issuable upon the exercise of any other Series E Warrants, except as provided in paragraph 4(c)(7D)(3) below.  In the event the Class A Warrants become exercisable, they shall become exercisable on the date on which the Corporation's FY

-34-

1997 Audited Statements are completed and issued by the independent certified public accountant performing the audit thereon. In the event there is a Sale of the Corporation before the end of FY 1997, no Class A Warrants shall become exercisable and the Class A Warrants shall be canceled and terminated. If the Class A Warrants become exercisable, they shall be exercisable until the earlier of (x) seven (7) years from the date the Class A Warrants become exercisable, or (y) the time at which there is a Sale of the Corporation, or (z) the time at which there is an underwritten public offering of shares of Common Stock of the Corporation.

7B. <u>Class B Warrants</u>. The holders of shares of Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock shall receive, on the date of the Second Closing (as defined in the Series E, F and G Purchase Agreement), warrants (the "Class B Warrants") to purchase shares of Series E Preferred Stock or Common Stock if all shares of Series E Preferred Stock have been converted to Common Stock, to purchase an aggregate of three percent (3%) of the Corporation on a Fully-Diluted Basis (as hereinafter defined). The Class B Warrants shall become exercisable in the event that, for the fiscal year ended February, 1998 ("FY 1998"), (i) the Store Contribution is less than or equal to six percent (6%) (the "1998 Store Contribution Percentage") of the Corporation's sales (excluding proceeds from real estate sale-lease back transactions), or (ii) Administration Expense exceeds twenty million dollars ($20,000,000). In the event there is an underwritten public offering of shares of the Common Stock of the Corporation or a Sale of the Corporation during FY 1997 or FY 1998, no Class B Warrants shall become exercisable and the Class B Warrants shall be canceled and terminated. For purposes of the Class B Warrants, Store Contribution and Administration Expense shall be calculated using the information reflected in the Corporation's audited financial statements for FY 1998 ("FY 1998 Audited Statements"). In the event the Class B Warrants become exercisable, they shall become exercisable on the date on which the Corporation's FY 1998 Audited Statements are completed and issued by the independent certified public accountants performing the audit thereon. If the Class B Warrants become exercisable, they shall be exercisable until the earlier of (x) seven (7) years from the date the Class B Warrants become exercisable, or (y) the time at which there is a Sale of the Corporation, or (z) the time at which there is an underwritten public offering of shares of Common Stock of the Corporation.

7C. <u>Class C Warrants</u>. The holders of shares of Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock shall receive, on the date of the Second Closing (as defined in the Series E, F and G Purchase Agreement), warrants (the "Class C Warrants") to purchase shares of Series E Preferred Stock, or Common Stock if all shares of Series E Preferred Stock have been converted to Common Stock, to purchase up to an aggregate of fifteen percent (15%) of the Corporation on a Fully-Diluted Basis (as hereinafter defined). The Class C Warrants shall become exercisable in the event there is a Sale of the Corporation on or before February 1, 2001 and before an underwritten public offering of shares of Common Stock of the Corporation, in accordance with the following terms and conditions:

-35-

(1)     If there is a Sale of the Corporation prior to June 1, 1997, in which the Equity Value (as hereinafter defined) is less than or equal to two hundred twenty million dollars ($220,000,000), the Class C Warrants shall become exercisable for an aggregate of (a) fifteen percent (15%) of the Corporation on a Fully-Diluted Basis if the Equity Value is less than or equal to one hundred eighty million dollars ($180,000,000), or (b) ten percent (10%) of the Corporation on a Fully-Diluted Basis if the Equity Value is between one hundred eighty million and one dollars ($180,000,001) and two hundred million dollars ($200,000,000), or (c) five percent (5%) of the Corporation on a Fully-Diluted Basis if the Equity Value is between two hundred million and one dollars ($200,000,001) and two hundred twenty million dollars ($220,000,000). If the Equity Value in the event of a Sale of the Corporation prior to June 1, 1997 is greater than two hundred twenty million and one dollars ($220,000,001), then no Class C Warrants shall become exercisable and the Class C Warrants shall be canceled and terminated.

(2)     If there is a Sale of the Corporation on or after June 1, 1997 and prior to February 1, 2001, in which the Equity Value is less than or equal to two hundred fifty million dollars ($250,000,000), the Class C Warrants shall become exercisable for purchase an aggregate of (a) fifteen percent (15%) of the Corporation on a Fully-Diluted Basis if the Equity Value is less than or equal to two hundred ten million dollars ($210,000,000) or (b) ten percent (10%) of the Corporation on a Fully-Diluted Basis if the Equity Value is between two hundred ten million and one dollars ($210,000,001), and two hundred thirty million dollars ($230,000,000), or (c) five percent (5%) of the Corporation on a Fully-Diluted Basis if the Equity Value is between two hundred thirty million and one dollars ($230,000,001) and two hundred fifty million dollars ($250,000,000). If the Equity Value in the event of a Sale of the Corporation on or after June 1, 1997 is greater than two hundred fifty million and one dollars ($250,000,001), then no Class C Warrants shall become exercisable and the Class C Warrants shall be canceled and terminated.

(3)     For purposes of this provision, the term "Equity Value" shall mean the aggregate net proceeds from a Sale of the Corporation that are to be paid to the holders of all then-outstanding shares of Common Stock and Preferred Stock, without taking into consideration payments that would be made for shares of Series E Preferred Stock or Common Stock that would be issued upon the exercise of the Class C Warrants, with any consideration that is other than cash valued in accordance with paragraph 4(c)(3E) hereof.

(4)     If there is an underwritten public offering of shares of Common Stock of the Corporation before any Class C Warrants become exercisable, or if there has been no Sale of the Corporation on or before February 1, 2001, no Class C Warrants shall become exercisable and the Class C Warrants shall be canceled and terminated.

(5)     The Class C Warrants shall be exercisable at the time of the Sale of the Corporation and, if not exercised at such time, shall terminate.

7D.  Other Terms of Series E Warrants.

(1)     The Class A Warrants, Class B Warrants and Class C Warrants shall collectively be referred to as the "Series E Warrants."

(2)     The Series E Warrants shall be exercisable for a purchase price of one cent ($.01) per share of Series E Preferred Stock or Common Stock for which such warrants are exercised, and such exercise price of one cent ($.01) per share shall be the original issue price of any shares of Series E Preferred Stock issued upon the exercise of the Series E Warrants (the "Series E Warrant Shares").

(3)     The number of shares of stock for which the Class A Warrants are exercisable shall not be diluted if the Class B Warrants or Class C Warrants become exercisable, and the number of shares of stock for which the Class B Warrants are exercisable shall not be diluted if the Class C Warrants become exercisable. In the event Class B Warrants become exercisable at a time when Class A Warrants are exercisable and have not been exercised, the number of shares of Series E Preferred Stock or Common Stock, as the case may be, to be issued upon the exercise of the Class A Warrants shall be adjusted to ensure that the Class A Warrants, in the aggregate, are exercisable for three percent (3%) of the Corporation on a Fully-Diluted Basis assuming the exercise of the Class B Warrants.  In the event Class C Warrants become exercisable at a time when Class A Warrants and/or Class B Warrants are exercisable and have not been exercised, the number of shares of Series E Preferred Stock or Common Stock, as the case may be, to be issued upon the exercise of the (a) Class A Warrants shall be adjusted to ensure that the Class A Warrants, in the aggregate, are exercisable for three percent (3%) of the Corporation on a Fully-Diluted Basis assuming the exercise of the Class C Warrants, and (b) Class B Warrants shall be adjusted to ensure that the Class B Warrants, in the aggregate, are exercisable for three percent (3%) of the Corporation on a Fully-Diluted Basis assuming the exercise of the Class C Warrants.

(3)     Notwithstanding anything herein to the contrary, (i) Accruing Dividends for the Series E Warrant Shares shall be the same in all respects as Accruing Dividends on the shares of Series E Preferred Stock that are not Series E Warrant Shares, except that Accruing Dividends shall accrue dividends at the rate per annum of $.0008 per share in respect of the Series E Warrant Shares; (ii) Special Accruing Dividends for the Series E Warrant Shares shall be the same in all respects as Special Accruing Dividends on the shares of Series E Preferred Stock that are not Series E Warrant Shares, except that Special Accruing Dividends shall be calculated on the original issue price of $.01 per share in the case of the Series E Warrant Shares (calculated from the date of original issuance of the Series E Warrant Shares); (iii) the Series E Liquidation Preference Payment for each Series E Warrant Share shall be an amount equal to one cent ($.01) per share plus, in the case of each share, an amount equal to dividends (consisting only of Accruing Dividends) accrued but unpaid thereon, computed to the date payment thereof is made available; (iv) the Series E Conversion Price for each Series E Warrant Share shall be $.01 per share; (v) the Series E Redemption Price for each Series E Warrant Share

shall be an amount equal to one cent ($.01) per share plus an amount equal to all dividends (including Accruing Dividends and Special Accruing Dividends) declared and paid thereon or otherwise deemed due thereon; and (vi) the Series E Target Return Price for the Series E Warrant Shares shall be calculated based on the original per share purchase price of $.01 per Series E Warrant Share.

       7E.  Allocation of Series E Warrants to Holders of Preferred Stock. The Class A Warrants and the Class B Warrants shall be allocated to the holders of the Series E Preferred Stock, the holders of the Series F Preferred Stock and holders of the Series G Preferred Stock pro rata, so that each holder of Series E Preferred Stock, Series F Preferred Stock and/or Series G Preferred Stock receives that portion of the Class A Warrants or Class B Warrants as the number of shares of Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock held by such holder bears to the total number of shares of Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock issued and outstanding at such time. The Class C Warrants shall be allocated to the C, D, E, F and G Preferred Holders pro rata, so that each C, D, E, F and G Preferred Holder receives that portion of the Class C Warrants as the liquidation preference payment amounts for the shares of Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock held by such holder bear to the aggregate liquidation preference payment amounts for all Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock and Series G Preferred Stock issued and outstanding at such time.

       8.  Amendments. Except where the vote or written consent of the holders of a greater number of shares of the Preferred Stock the Corporation is required by law or the Certificate of Incorporation, and except where the provisions of paragraph 4(c)(4G) apply, (1) no provision of the terms of the Series A Preferred Stock may be amended, modified or waived without the written consent or affirmative vote of the holders of at least sixty six and two-thirds percent (66-2/3%) in interest of the then outstanding shares of Series A Preferred Stock; (2) no provision of the terms of the Series C Preferred Stock may be amended, modified or waived without the written consent or affirmative vote of the holders of at least fifty-five percent (55%) in interest of the then outstanding shares of Series C Preferred Stock; (3) no provision of the terms of the Series D Preferred Stock may be amended, modified or waived without the written consent or affirmative vote of the holders of at least sixty six and two-thirds percent (66-2/3%) in interest of the then outstanding shares of Series D Preferred Stock; (4) no provision of the terms of the Series E Preferred Stock may be amended, modified or waived without the written consent or affirmative vote of the holders of at least a majority in interest of the then outstanding shares of Series E Preferred Stock; and (5) no provision of the terms of the Series F Preferred Stock may be amended, modified or waived without the written consent or affirmative vote of the holders of at least a majority in interest of the then outstanding shares of Series F Preferred Stock; and (6) no provision of the terms of the Series G Preferred Stock may be amended, modified or waived without the written consent or affirmative vote of the holders of at least a majority in interest of the then outstanding shares of Series G Preferred Stock.

9. <u>Definitions</u>. As used herein, the following terms shall have the following meanings:

(1)     The term "Reserved Employee Shares" shall mean (i) shares of Common Stock reserved by the Corporation from time to time for the exercise of options to purchase Common Stock granted to employees of the Corporation and (ii) purchases by employees of shares of Common Stock, not to exceed in the aggregate 2,800,000 shares on the date hereof (appropriately adjusted to reflect an event described in Section 4(c)(5F) hereof).

(2)     "Series A Target Return Price" shall mean an amount equal to (i) the original per share purchase price of the Series A Preferred Stock, increased by (ii) thirty-seven and one-half percent (37.5%) per annum, compounded on an annual basis measured from the date of issuance to the date of calculation, pro-rated for any partial years, reduced by (iii) the per share amount of any dividends or other distributions on account of the Series A Preferred Stock <u>actually made</u> prior to the date of calculation.

(3)     "Series C Target Return Price" shall mean an amount equal to (i) the original per share purchase price of the Series C Preferred Stock, increased by (ii) thirty-seven and one-half percent (37.5%) per annum, compounded on an annual basis measured from the date of issuance to the date of calculation, pro-rated for any partial years, reduced by (iii) the per share amount of any dividends or other distributions on account of the Series C Preferred Stock <u>actually made</u> prior to the date of calculation.

(4)     "Series D Target Return Price" shall mean an amount equal to (i) the original per share purchase price of the Series D Preferred Stock, increased by (ii) thirty-seven and one-half percent (37.5%) per annum, compounded on an annual basis measured from the date of issuance to the date of calculation, pro-rated for any partial years, reduced by (iii) the per share amount of any dividends or other distributions on account of the Series D Preferred Stock <u>actually made</u> prior to the date of calculation.

(5)     "Series E Target Return Price" shall mean an amount equal to (i) the original per share purchase price of the Series E Preferred Stock, increased by (ii) thirty-seven and one-half percent (37.5%) per annum, compounded on an annual basis measured from the date of issuance to the date of calculation, pro-rated for any partial years, reduced by (iii) the per share amount of any dividends or other distributions on account of the Series E Preferred Stock <u>actually made</u> prior to the date of calculation.

(6)     "Series F Target Return Price" shall mean an amount equal to (i) the original per share purchase price of the Series F Preferred Stock, increased by (ii) thirty-seven and one-half percent (37.5%) per annum, compounded on an annual basis measured from the date of issuance to the date of calculation, pro-rated for any partial years, reduced by (iii) the per share amount of any dividends or other distributions on account of the Series F Preferred Stock <u>actually made</u> prior to the date of calculation.

(7)    "Series G Target Return Price" shall mean an amount equal to (i) the original per share purchase price of the Series G Preferred Stock, increased by (ii) thirty seven and one-half percent (37.5%) per annum, compounded on an annual basis measured from the date of issuance to the date of calculation, pro-rated for any partial years, reduced by (iii) the per share amount of any dividends or other distributions on account of the Series G Preferred Stock actually made prior to the date of calculation.

(8)    "Series A Purchase Agreement" means that certain Series A Convertible Preferred Stock Purchase Agreement dated as of November 11, 1992, as amended, by and among the Corporation and certain investors named therein, and relating to the purchase and sale of up to an aggregate of 1,045,755 shares of Series A Preferred Stock.

(9)    "Series D Purchase Agreement" means that certain Series D Convertible Preferred Stock Purchase Agreement dated as of December 16, 1994 by and among the Corporation and certain investors named therein and relating to the purchase and sale of up to an aggregate of 1,558,372 shares of Series D Preferred Stock.

(10)    "Series E, F and G Purchase Agreement" means that certain Series E, F and G Convertible Preferred Stock Purchase Agreement of even date herewith by and among the Corporation and certain investors named therein and relating to the purchase and sale of up to an aggregate of 907,260 shares of Series E Preferred Stock, 1,509,400 shares of Series F Preferred Stock and 1,098,406 shares of Series G Preferred Stock.

(11)    "DLJ Warrants" means the warrants dated December 16, 1994 issued to DLJ Capital Corporation and DLJ First ESC L.L.C. to purchase an aggregate of 40,000 shares of the Series C Preferred Stock or Common Stock for $14.50 per share, or any warrants issued in exchange therefor.

(d)    The voting power, preferences and rights (and the qualification, limitations or restrictions thereof) of the Common Stock are as follows:

1.    Relative Rights of Preferred Stock and Common Stock.  All preferences, relative, participating, optional or other special rights and privileges, and qualifications, limitations, or restrictions of the Common Stock are expressly made subject and subordinate to those that may be fixed with respect to any shares of the Preferred Stock.

2.    Voting Rights.  Except as otherwise required by law or this Certificate of Incorporation, each holder of Common Stock shall have one vote in respect of each share of stock held by him of record on the books of the Corporation for the election of directors and on all matters submitted to a vote of stockholders of the Corporation.

3.    Dividends.  Subject to the preferential rights of the Preferred Stock, the holders of shares of Common Stock shall be entitled to receive, when and if declared by the

-40-

Board of Directors, out of the assets of the Corporation which are by law available therefor, dividends payable either in cash, in property or in shares of capital stock.

       4.     <u>Dissolution, Liquidation or Winding Up</u>. In the event of any dissolution, liquidation or winding up of the affairs of the Corporation, after distribution in full of the preferential amounts, if any, to be distributed to the holders of shares of the Preferred Stock and subject to the provisions of Paragraph 3 of the description of the terms of the Preferred Stock, holders of Common Stock shall be entitled, unless otherwise provided by law or this Certificate of Incorporation, to receive all of the remaining assets of the Corporation of whatever kind available for distribution to stockholders ratably in proportion to the number of shares of Common Stock hold by them respectively.

       5.     No holder of shares of the Corporation of any class shall be entitled as such, as a matter of right, to subscribe for, purchase, or receive any shares of the Corporation of any class, or any securities convertible into, exchangeable for, or carrying a right or option to purchase its shares of any class, whether now or hereafter authorized and whether issued, sold, or offered for sale by the Corporation for cash or other consideration or by way of dividend, split of shares, or otherwise.

     5.     The name and mailing address of the incorporator are as follows:

| <u>NAME</u> | <u>MAILING ADDRESS</u> |
|---|---|
| Dean H. Cannon | Beveridge & Diamond, P.C. |
| | 1350 I Street, N.W. |
| | Suite 700 |
| | Washington, D.C.  20005 |

     6.     The Corporation is to have perpetual existence.

     7.     The personal liability of the directors of the Corporation is hereby eliminated to the fullest extent permitted by the provisions of paragraph (7) of subsection (b) of § 102 of the General Corporation Law of the State of Delaware, as the same may be amended and supplemented.

     8.     The Corporation shall, to the fullest extent permitted by the provisions of § 145 of the General Corporation Law of the State of Delaware, as the same may be amended and supplemented, indemnify any and all persons whom it shall have power to indemnify under said section from and against any and all of the expenses, liabilities, or other matters referred to in or covered by said section, and the indemnification provided for herein shall not be deemed exclusive of any other rights which those indemnified may be entitled under any Bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office, and shall continue as to a person who

has ceased to be a director, officer, employee, or agent and shall inure to the benefit of the heirs, executors, and administrators of such a person.

9.    From time to time any of the provisions of this certificate of incorporation may be amended, altered, or repealed, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted in the manner and at the time prescribed by said laws, and all rights at any time conferred upon the stockholders of the Corporation by this Certificate of Incorporation are granted subject to the provisions of this Article 9.

Signed on November 22, 1996.

Dean H. Cannon, Incorporator

O:\CLN11\80\2823\AGR\2823DHC.82B

-42-

# EXHIBIT 4

 

An Official **Pennsylvania** Government Website

pennsylvania
DEPARTMENT OF STATE

**Business**     UCC     Trademark     CROP       [ Login ]

⌂ Home

Search

▤ Initial Forms

? Help

# Business Search

*As of 09/16/2024 we have processed all business filings received in our office through 09/11/2024.*

**Business Search Info:** ⌄

Dick's Sporti   🔍

Advanced ⌄

Results: 1

| Filing Information ⇅ | Initial Filing Date ⇅ | Stat |
|---|---|---|
| DICK'S SPORTING GOODS, INC. (2861537) > | 02/17/1999 | Acti |

DICK'S SPORTING GOODS, INC. (2861537)

Request Certificate

| | |
|---|---|
| *Initial Filing Date* | **02/17/1999** |
| *Status* | **Active** |
| *Formed In* | **DELAWARE** |
| *Filing Type* | **Foreign Business Corporation** |
| *Registered Office* | **Corporation Service Company County: Dauphin** |
| *Officers* | **Treasurer ARTHUR ROSENBERG 345 COURT ST CORAOPOLIS PA 15108-3817** |
| | **President JOHN CHENDO 345 COURT ST CORAOPOLIS PA 15108-3817** |
| | **Vice President JOHN CHENDO 345 COURT ST CORAOPOLIS PA 15108-3817** |
| | **Secretary JOHN CHENDO 345 COURT ST CORAOPOLIS PA 15108-3817** |

↺ View History

 Request Access

‹

Skip to main content

**ania** Government Website

Business     UCC     Trademark     CROP

⌂ Home

Search

▤ Initial Forms

? Help

# DICK'S SPORTING GOODS, INC. (2861537)

Request Certificate

| | |
|---|---|
| Initial Filing Date | 02/17/1999 |
| Status | Active |
| Formed In | DELAWARE |
| Filing Type | Foreign Business Corporation |
| Registered Office | Corporation Service Company County: Dauphin |
| Officers | Treasurer ARTHUR ROSENBERG 345 COURT ST CORAOPOLIS PA 15108-3817 |
| | President JOHN CHENDO 345 COURT ST CORAOPOLIS PA 15108-3817 |
| | Vice President JOHN CHENDO 345 COURT ST CORAOPOLIS PA 15108-3817 |
| | Secretary JOHN CHENDO 345 COURT ST CORAOPOLIS PA 15108-3817 |

View History          Request Access



An Official **Pennsylvania** Government Website

**pennsylvania**
DEPARTMENT OF STATE

Business    UCC    Trademark    CROP

Login

🏠 Home

Search

📋 Initial Forms

❓ Help

# Business Search

*As of 09/16/2024 we have processed all business filings received in our office through 09/11/2024.*

Business Search Info: ⌄

Dick's Sporting Goods, Inc 🔍

Advanced ⌄

Results: 1

| Filing Information ⇕ | Initial Filing Date ⇕ | Status ⇕ | Entity Type ⇕ | Formed In ⇕ | Address ⇕ |
|---|---|---|---|---|---|
| DICK'S SPORTING GOODS, INC. (2861537) › | 02/17/1999 | Active | Foreign Business Corporation | DELAWARE | Corporation Service Company |

‹

Skip to main content

**ania** Government Website

| Business | UCC | Trademark | CROP |
|----------|-----|-----------|------|

⌂ Home

Search

▤ Initial Forms

? Help

‹

# EXHIBIT 5



# EXHIBIT 6

**John Prew**

| | |
|---|---|
| **From:** | ryan stearnlaw.com <ryan@stearnlaw.com> |
| **Sent:** | Tuesday, September 10, 2024 1:49 PM |
| **To:** | John Prew |
| **Cc:** | Cathy Conti |
| **Subject:** | RE: Anthony Sackett v. Dick's Sporting Goods |
| **Attachments:** | Complaint.filed.9.10.24.pdf; Jury Demand.file.9.10.24.pdf; eSummons_24-013055-CP.pdf |

John:

Please find attached hereto the following documents regarding the above referenced matter:

1. Summons
2. Complaint
3. Jury Demand

Please advise as to whether you will accept service on behalf of Dick's Sporting Goods and its employee Dominique.

Thank you,

## RYAN B. STEARN, ESQ.
### THE LAW OFFICE OF RYAN B. STEARN, P.C.
**Address:** 29829 Greenfield Road, Ste 103, Southfield, MI 48076
☎ **Phone:** 248-213-7443
**Fax:** 248-213-7444
**E-mail:** ryan@stearnlaw.com

**We Service your legal needs.**
**General Litigation, Collections, Real Estate, Contracts, Defense**

**From:** John Prew <jprew@harveykruse.com>
**Sent:** Thursday, September 5, 2024 3:10 PM
**To:** Stipanovich, Douglas J <Douglas.Stipanovich@dcsg.com>; ryan stearnlaw.com <ryan@stearnlaw.com>
**Cc:** John Prew <jprew@harveykruse.com>; Cathy Conti <cconti@harveykruse.com>
**Subject:** RE: Anthony Sackett v. Dick's Sporting Goods

Hi Ryan,

Here is my contact information.  Please include my assistant, Cathy Conti, on all communications.  I have copied Cathy in on this email.

Thanks,

John R. Prew
Managing Partner
HARVEY | KRUSE, P.C.
Attorneys & Counselors
*Dedicated to Excellence Since 1969*
1050 Wilshire Drive, Ste. 320

1

Troy, MI 48084-1526
Office: 248-649-7800
Direct: 248-649-9216
jprew@harveykruse.com



**From:** Stipanovich, Douglas J <Douglas.Stipanovich@dcsg.com>
**Sent:** Thursday, September 5, 2024 2:22 PM
**To:** ryan stearnlaw.com <ryan@stearnlaw.com>
**Cc:** John Prew <jprew@harveykruse.com>
**Subject:** RE: Anthony Sackett v. Dick's Sporting Goods

Ryan –

I've copied our counsel, John Prew at Harvey Kruse, and you can work with him directly moving forward.  But to answer your questions, we are not permitted to share employee information absent a subpoena or formal discovery request.  We will agree to accept service and you can effectuate that through John's office.

Thank you.

Doug

**Douglas J. Stipanovich**
**Senior Corporate Counsel**
345 Court Street  |  Coraopolis, PA  15108
douglas.stipanovich@dcsg.com  |  o: 724.273.4540



**From:** ryan stearnlaw.com <ryan@stearnlaw.com>
**Sent:** Tuesday, September 3, 2024 1:47 PM
**To:** Stipanovich, Douglas J <Douglas.Stipanovich@dcsg.com>
**Subject:** [EXTERNAL] RE: Anthony Sackett v. Dick's Sporting Goods

**CAUTION: This email originated from outside the DICK'S Sporting Goods network. Please do not click links or open attachments unless you recognize the source of this email.**

Doug:

Would you provide me with Dominique's last name and current address for service? Or do I have to conduct discovery for that information and amend my complaint later?

And are you accepting service on behalf of Dick's Sporting Goods and/or Dominique?

2

# RYAN B. STEARN, ESQ.
## THE LAW OFFICE OF RYAN B. STEARN, P.C.
**Address:** 29829 Greenfield Road, Ste 103, Southfield, MI  48076
☎ **Phone:** 248-213-7443
**Fax:** 248-213-7444
**E-mail:** ryan@stearnlaw.com

**We Service your legal needs.**
**General Litigation, Collections, Real Estate, Contracts, Defense**

**From:** ryan stearnlaw.com <ryan@stearnlaw.com>
**Sent:** Tuesday, September 3, 2024 10:40 AM
**To:** Stipanovich, Douglas J <Douglas.Stipanovich@dcsg.com>
**Subject:** RE: Anthony Sackett v. Dick's Sporting Goods

Doug:

Sorry about that.  Please find attached hereto the unprotected tax return.

# RYAN B. STEARN, ESQ.
## THE LAW OFFICE OF RYAN B. STEARN, P.C.
**Address:** 29829 Greenfield Road, Ste 103, Southfield, MI  48076
☎ **Phone:** 248-213-7443
**Fax:** 248-213-7444
**E-mail:** ryan@stearnlaw.com

**We Service your legal needs.**
**General Litigation, Collections, Real Estate, Contracts, Defense**

**From:** Stipanovich, Douglas J <Douglas.Stipanovich@dcsg.com>
**Sent:** Friday, August 30, 2024 10:16 AM
**To:** ryan stearnlaw.com <ryan@stearnlaw.com>
**Subject:** RE: Anthony Sackett v. Dick's Sporting Goods

Ryan –

The tax form appears to be password protected.  Can you please forward the password?  Thanks.

Doug

**Douglas J. Stipanovich**
**Senior Corporate Counsel**
345 Court Street  |  Coraopolis, PA  15108
douglas.stipanovich@dcsg.com  |  o: 724.273.4540



**From:** ryan stearnlaw.com <ryan@stearnlaw.com>
**Sent:** Thursday, August 22, 2024 2:47 PM
**To:** Stipanovich, Douglas J <Douglas.Stipanovich@dcsg.com>
**Subject:** [EXTERNAL] RE: Anthony Sackett v. Dick's Sporting Goods

CAUTION: This email originated from outside the DICK'S Sporting Goods network. Please do not click links or open attachments unless you recognize the source of this email.

Dear Mr. Stipanovich:

Pursuant to your request, please find attached hereto the following documents regarding Anthony Sackett's damages claim:

1. Business Financials from 1/1/2023 – 8/1/2023
2. Business Financials from 1/1/2024 – 8/1/2024
3. Anthony Sackett's Medical Records
4. Business Tax Return for 2023

If you wish to resolve the above referenced matter short of litigation, please contact me no later than Friday, August 30, 2024.

If you have any comments or questions, please feel free to contact me.

Thank you,

# RYAN B. STEARN, ESQ.
## THE LAW OFFICE OF RYAN B. STEARN, P.C.
**Address:** 29829 Greenfield Road, Ste 103, Southfield, MI 48076
☎ **Phone:** 248-213-7443
**Fax:** 248-213-7444
**E-mail:** ryan@stearnlaw.com

**We Service your legal needs.**
**General Litigation, Collections, Real Estate, Contracts, Defense**

**From:** Stipanovich, Douglas J <Douglas.Stipanovich@dcsg.com>
**Sent:** Monday, August 19, 2024 12:34 PM
**To:** ryan stearnlaw.com <ryan@stearnlaw.com>
**Subject:** RE: Anthony Sackett v. Dick's Sporting Goods

Ryan –

My apologies.  I was traveling last week and in a mediation today.  I will call you no later than tomorrow.

Doug

**Douglas J. Stipanovich**
**Senior Corporate Counsel**
345 Court Street | Coraopolis, PA 15108
douglas.stipanovich@dcsg.com | o: 724.273.4540

4



**From:** ryan stearnlaw.com <ryan@stearnlaw.com>
**Sent:** Monday, August 19, 2024 12:23 PM
**To:** Stipanovich, Douglas J <Douglas.Stipanovich@dcsg.com>
**Subject:** [EXTERNAL] Anthony Sackett v. Dick's Sporting Goods

> CAUTION: This email originated from outside the DICK'S Sporting Goods network. Please do not click links or open attachments unless you recognize the source of this email.

Dear Mr. Stipanovich:

Please be advised that I have been retained by Anthony Sackett to file a complaint against Dick's Sporting Goods and its representative, Dominique. I have left numerous messages for you with no response.

Please find attached hereto a draft Complaint. Please advise as to whether you are willing to accept service on behalf of Dick's Sporting Goods and its agent, Dominique. Please also advise as to Dominique's last name and, if not accepting service, her address. If I do not receive a response from you by Friday, August 23, 2024, I will proceed to file the complaint and serve the same in accordance with Michigan Law. I will also seek the information requested on Dominique, through discovery, and upon receipt, seek to amend the complaint to include such information.

If you have any comments or questions, or wish to discuss this matter, please feel free to contact me.

Thank you,

**RYAN B. STEARN, ESQ.**
**THE LAW OFFICE OF RYAN B. STEARN, P.C.**
**Address:** 29829 Greenfield Road, Ste 103, Southfield, MI 48076
☎ **Phone:** 248-213-7443
**Fax:** 248-213-7444
✉ **E-mail:** ryan@stearnlaw.com

**We Service your legal needs.**
**General Litigation, Collections, Real Estate, Contracts, Defense**

The information contained in this message and any attachments (collectively, the "Transmission") from Dick's Sporting Goods, Inc. or one of its subsidiaries contains confidential information and is intended solely for the named recipient(s). If you are not a named recipient, you are prohibited from copying, distributing or using this Transmission. Please contact the sender immediately by returning the e-mail and deleting the original Transmission.

# EXHIBIT 7

SUMMONS

Case No. : **24-013055-CP**

## PROOF OF SERVICE

**TO PROCESS SERVER:** You must serve the summons and complaint and file proof of service with the court clerk before the expiration date on the summons. If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE OF SERVICE / NONSERVICE

☐ I served ☐ personally ☐ by registered or certified mail , return receipt requested, and delivery restricted to the addressee(copy of return receipt attached) a copy of the summons and the complaint, together with the attachments listed below, on:

☐ I have attempted to serve a copy of the summons and complaint, together with the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|---|---|
| | |

Place or address of service

Attachments (if any)

☐ I am a sheriff,deputy sheriff, bailiff, appointed court officer or attorney for a party.

☐ I am a legally competent adult who is not a party or an officer of a corporate party. I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled $ | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled $ | Fee $ | Total fee $ | Name (type or print) |

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with

_Exhibits 1-5_ on _9/24/24 at 11:30a.m_
Attachments (if any)                                  Date and time

_____ on behalf of _Dicks Sporting Goods, Inc._

Signature _John R Prew_

MCL 600.1910, MCR 2.104, MCR 2.105

Original – Court     2nd Copy – Plaintiff
1st Copy – Defendant     3rd Copy – Return

| STATE OF MICHIGAN<br>THIRD JUDICIAL CIRCUIT<br>WAYNE COUNTY | SUMMONS | CASE NO.<br>24-013055-CP<br>Hon.Qiana Denise Lillard |
|---|---|---|

Court telephone no.: 313-224-2240

| Plaintiff's name(s), address(es), and telephone no(s)<br>Sackett, Anthony | v | Defendant's name(s), address(es), and telephone no(s).<br>Dick's Sporting Goods, Inc. |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no<br>Ryan B. Stearn 57897<br>29829 Greenfield Rd Ste 103<br>Southfield, MI 48076-2201 | | |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in ☐ this court, _____ Court, where it was given case number _____ and assigned to Judge _____.

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.    | **SUMMONS** |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>9/10/2024 | Expiration date*<br>12/10/2024 | Court clerk<br>Samiah Rahnuma |
|---|---|---|

Cathy M. Garrett- Wayne County Clerk.

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (3/23)     **SUMMONS**     MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105